[No. F043502. Fifth Dist. June 25, 2004.]

BRASHER'S CASCADE AUTO AUCTION, Plaintiff and Appellant, v. VALLEY AUTO SALES AND LEASING, Defendant and Respondent.

1040

**COUNSEL**

The Miles Law Firm and Lawrence W. Miles, Jr., for Plaintiff and Appellant.

Fishback, Dominick, Bennett, Stepter, Ardaman, Ahlers & Bonus and Charles R. Stepter, Jr., for National Auto Auction Association as Amicus Curiae on behalf of Plaintiff and Appellant.

D. Mitchell Taylor for Defendant and Respondent.

**OPINION**

**DAWSON, J.**—The Uniform Commercial Code establishes rules that address a variety of situations where losses must be allocated between relatively innocent parties because a third party whose misconduct caused the loss is insolvent or no longer available. That situation is presented here. A middleman who purchased vehicles from an auction company-secured lender and resold the vehicles to a used car dealer failed to apply the proceeds from the resale to pay off the auction company-secured lender. This appeal concerns whether the loss caused by the insolvent middleman should be borne by the auction company-secured lender or by the used car dealer.

The fundamental legal question raised in this appeal is whether, under the former version of the California Uniform Commercial Code,[1] a merchant buyer was required to observe reasonable commercial standards to qualify as a buyer in the ordinary course of business for purposes of section 9307. If the merchant buyer attained buyer in the ordinary course status, then it would have purchased the goods free of any perfected security interest.

We hold that the former version of the California Uniform Commercial Code requires a merchant buyer to adhere to reasonable commercial standards to obtain the status of a buyer in the ordinary course. The ultimate policy goal of the statute is not served best by allowing a merchant buyer to engage in modes of dealing that are commercially unreasonable without bearing responsibility for the losses resulting from those modes of dealing.

The application of reasonable commercial standards presents a question of fact not addressed by the trial court. Accordingly, we reverse and remand for further proceedings.

## FACTS

*Parties and Background*

Appellant Brasher's Cascade Auto Auction (Auction) operates an automobile auction located in Oregon. Auction sells automobiles as a consignee and functions as a wholesale clearinghouse that liquidates used cars for its consignors, which include banks, financing companies, fleet and lease companies, manufacturers, government agencies, and new and used car dealerships. In connection with its auction business, Auction provides financing to preapproved buyers on certain vehicles it designates.

Respondent Ronald P. Fena, Inc., doing business as Valley Auto Sales and Leasing (Valley), operates a used car dealership in Fresno County, California.

Pacific Title Service, Inc. (Pacific) was a used car wholesaler in Oregon. Pacific bought cars and resold them to dealers. Pacific was owned by Rhonda

---

[1] All further statutory references are to the version of the California Uniform Commercial Code in effect during 2000, unless otherwise indicated.

The parties agree and the trial court correctly ruled that the version in place in 2000 governs this case, notwithstanding the quotes in Valley's appellate brief of the definition of "buyer in ordinary course of business" from the version of section 1201 that became effective July 1, 2001.

Huillier, a daughter-in-law of Robert Huillier, who worked for Pacific buying and selling cars.[2]

Transactions involving Robert Huillier, Valley, and Auction first began in 1994 when Robert Huillier was authorized by Valley to act as its agent for the purpose of purchasing vehicles from Auction. After March 1998, Robert Huillier stopped acting as an agent for Valley and began to work exclusively for Pacific. In April 1998, Robert Huillier began to buy vehicles from Auction on behalf of Pacific.

Robert Huillier was convicted of two felonies in California in the 1980's relating to odometer rollback and to obtaining vehicles valued at approximately $800,000 from Bay Cities Auto Auction without paying for them. After serving time and attempting to reestablish himself in Fresno, California, Robert Huillier moved to Oregon and started Huillier Auto Wholesale. When the bond issued to Huillier Auto Wholesale was cancelled by the insurer, Pacific was formed and Robert Huillier went to work for it.

*Transactions Between Consignor and Auction*

Auction sells vehicles on consignment and sometimes extends credit to the buyers purchasing vehicles at its auctions. Although consignors selling vehicles through Auction are not required to provide certificates of title to the vehicles at the time of the auction sale, approximately 70 percent of the time the consignor will deliver the certificate of title to Auction before the vehicle goes on the auction block. Auction does not pay a consignor for a vehicle until after it is sold and the consignor delivers the vehicle's title documents to Auction. In addition to holding payment, Auction motivates consignors to deliver title documents through its rules, which assess consignors a late title charge for any title not provided within three weeks of the sale date.

Because Auction's payment to the consignor depends upon when the consignor delivers title, the actual length of time between the sale of a vehicle at auction and payment of the consignor varies. For example, of the nine vehicles sold to Pacific on August 3, 2000, Auction paid the consignors of eight of the vehicles with checks dated August 7, 2000. Auction paid for the ninth vehicle with a check dated September 21, 2000.

---

[2] Pacific, Rhonda Huillier, and Robert Huillier were named as defendants in Auction's lawsuit below, but they are not parties to this appeal. A terminating sanction was entered against Pacific and defaults were entered against the individuals.

*Transactions Between Auction and Pacific*

Auction sold the 32 vehicles that are the subject of this lawsuit to Pacific between July 6 and September 7, 2000. The total amount owed by Pacific to Auction for the purchase of the 32 vehicles was $300,299.

The terms of Pacific's obligation to pay for the vehicles arose from its position as a buyer at an auction and as a debtor that financed its purchases through Auction. A preprinted dealer registration form Pacific was required to complete to do business with Auction included Pacific's agreement to "honor promptly all checks and drafts presented for payment for vehicles purchased at Auction." Pacific obtained financing through Auction by executing a document called "4-Week Float Pre-Authorization Request" (Float Program) which required Pacific to pay for the vehicles on the earlier of 28 days from the date of purchase or when Pacific sold the vehicles to third parties.[3] Pacific signed three of these request forms; they were dated July 12, 2000, August 2, 2000, and September 7, 2000. In approving the first two requests, Auction indicated that the amount Pacific was authorized to purchase under the Float Program in that month was $100,000. The amount authorized was left blank in the last request form.

To collateralize Pacific's payment obligation under the Float Program, Auction retained and perfected a security interest in the vehicles it sold to Pacific. Pacific signed a financing statement on a standard form UCC-1 that named Auction as the secured party. Auction filed the financing statement with the Oregon Secretary of State on March 2, 2000. The financing statement covered collateral that included inventories, whether "now owned or hereafter acquired." As additional protection, Auction obtained and held the certificates of title for the 32 vehicles.

The signed drafts Pacific provided to Auction to pay for vehicles took approximately 20 to 25 days to clear after Auction submitted them to the bank for processing. Apparently, the draft and title documents were submitted by Auction to Pacific's bank and (1) if Pacific honored the draft, the bank would pay Auction and forward the title documents to Pacific or (2) if Pacific dishonored the draft, the bank would return the draft and the title documents to Auction.

---

[3] Specifically, the preprinted form document used in the Float Program provides in part: "Applicant hereby agrees that if approved, undersigned shall leave a signed business check or a signed sight draft the day of the sale for all float vehicles purchased. Payment will be held: A) until Dealer requests vehicle title B) until 4-WEEK float period expires C) upon next subsequent sale of said vehicle, whichever occurs first."

*Transactions Between Pacific and Valley*

Pacific resold the 32 vehicles it purchased from Auction to Valley over a three-month period. Valley paid Pacific in full for each of the vehicles it purchased, and the price for each was consistent with fair market value. Valley acquired the vehicles individually and not as a sell-off of inventory that would qualify as a bulk sale.

Pacific had not received the certificates of title at the time it sold the vehicles to Valley because Auction (or perhaps the consignor) held the title documents to the vehicles at that time. Valley did not demand a certificate of title to a vehicle at the time it paid Pacific for the vehicle.

*Pacific's Failure to Pay Auction for the Vehicles*

Pacific received payment for each of the 32 vehicles from Valley, but failed to pay Auction for those vehicles.[4] Pacific's failure to pay Auction for the 32 vehicles is the reason the parties to this appeal became involved in litigation over their respective rights in the vehicles. The trial court found: "The evidence adduced at the trial demonstrated a bona fide dispute between the parties over titles to 32 vehicles which was caused almost entirely by the wrongful conduct of Pacific."

Auction became aware during the second week of September 2000 that Pacific was not paying for vehicles acquired under the Float Program when Auction was notified by Pacific's bank that the drafts provided by Pacific were being returned unpaid. About three or four days later, on September 19, 2000, Jerry Hinton, the general manager of Auction, reached Robert Huillier by telephone. Hinton testified that Huillier told him that Pacific would not pay the drafts, the vehicles had been sold to Valley, and Valley had paid Pacific in full for them.

After his conversation with Huillier, Hinton telephoned Ron Fena of Valley and told him that the 32 vehicles had been purchased from Auction by Pacific

---

[4] The failure by a debtor to use the proceeds from vehicle sales to pay off the secured lender who financed the debtor's purchase of the vehicles is referred to as selling the vehicles "out-of-trust." Professor Billings described the situation as follows: "Dealers go 'out of trust' by keeping all the money received from sale of a vehicle instead of remitting the acquisition cost to the floor planner. Normally the dealer sells a car for more than the acquisition cost and keeps only the profit, but a dealer short of cash is tempted also to keep the acquisition cost for operating expenses." (Billings, Floor Planning, Retail Financing, and Leasing in the Automobile Industry (2003) § 1:110; see generally Harrell, *Sales of Collateral "Out of Trust": Recent Cases Define Creditors' Rights* (1994) 48 Consumer Fin. L.Q. Rep. 233.)

and Auction had not been paid by Pacific for the vehicles. Both men were upset that Pacific's breach had left them with competing claims to the vehicles.

Pending the resolution of their dispute over the 32 vehicles, Auction and Valley entered into an agreement under which Auction provided certificates of title to the 32 vehicles as each one was sold to the general public by Valley and the amount of money owed to Auction for that vehicle was placed into an attorney trust account.

## PROCEDURAL HISTORY

Auction filed a complaint against Pacific, its principals Rhonda and Robert Huillier, and Valley. In its cause of action against Valley, Auction sought declaratory relief regarding its rights in the vehicles as a secured lender and the priority of those rights over the claims of Valley. Valley filed a cross-complaint against Auction for conversion of the title documents.

The matter was tried to the superior court on February 24 and 25, 2003. On April 30, 2003, the court issued a statement of decision in which it ruled that "[b]ecause Valley is a buyer in ordinary course of business with respect to the 32 vehicles . . . , it is entitled to the return of the sum of $300,299, currently on deposit, which are hereby ordered to be paid to it forthwith."

In reaching its decision, the superior court rejected Auction's legal argument that Valley could not be a buyer in the ordinary course under section 9307 of the California[5] Uniform Commercial Code unless it met the good faith standard for merchants contained in section 2103, subdivision (1)(b).

The superior court analyzed the criteria necessary for Valley to qualify as a buyer in the ordinary course as follows:

"Here Valley qualifies as a buyer in ordinary course of business. There is no dispute that Valley paid Pacific for each of the 32 vehicles. Further, although [Auction] suggests in its post-trial brief that it is inconceivable that Valley did not know Pacific was selling cars out of trust, no evidence was presented to that effect. Robert Huilliar [sic], the buyer for Pacific, testified that he did not tell Valley that [Auction] held a security interest in the

---

[5] During trial, Auction argued that the creation, attachment and perfection of its security interest were governed by the law of the State of Oregon. In their posttrial briefs and on appeal, both parties have applied California law in analyzing the priority of their competing claims. Accordingly, we apply California law to the dispute.

vehicles. Ron Fena, the President of Valley, testified that although he did not receive titles to the 32 vehicles at the time he paid for them, he was not concerned because he assumed there was a lien involved which would be cleared up in due course. He had purchased over 700 vehicles from Pacific and received titles on all of them except the 32 vehicles involved in this transaction, although it generally took between 60 and 90 days to receive them.

"[Auction's] claim to the effect it is inconceivable that Valley did not know Pacific was selling cars 'out-of-trust' is based primarily on Huilliar's prior felony conviction years earlier and Huilliar's business dealings with Valley since that time. However, extrapolating from Huilliar's admitted criminal past to specific knowledge on the part of Valley about the transactions in question is a leap the court is unwilling to make particularly where [Auction] itself extended credit to Huilliar's company, Pacific and dealt with Huilliar in a way which would not suggest any concern on its part about his past. Valley had extensive business dealings with Huilliar since his release from prison and it was not unreasonable for Valley to conclude that he had been rehabilitated, as, apparently, did [Auction]."

The trial court ruled Valley was entitled to the $300,299 held in trust pending the outcome of the litigation, and also ruled Auction was not liable for conversion of the certificates of title. Judgment was entered accordingly.

Auction filed a notice of appeal. Valley did not file a notice of cross-appeal challenging the denial of its cause of action for conversion.

## DISCUSSION

Auction contends Valley was not a buyer in the ordinary course of business (BIOC) and, therefore, did not take free of Auction's security interest under the provisions of section 9307.[6] To support this contention, Auction argues that the trial court committed legal error by applying the subjective standard of good faith contained in section 1201, subdivision (19), rather than the objective standard of good faith imposed upon merchants under section 2103, subdivision (1)(b). Auction further argues that, regardless of the standard of good faith applied, Valley failed to meet the "ordinary course" element in the definition of a BIOC for two reasons. First, Valley failed to obtain certificates of title when it paid for the vehicles. Second, Valley's transactions with Pacific violated former Vehicle Code section 5753.[7]

---

[6] Former section 9307 has been revised and recodified as section 9320. (See fn. 1, *ante*.)

[7] All further references to Vehicle Code section 5753 will be to the version of that section in effect during 2000, unless otherwise indicated.

In response, Valley asserts that (1) the trial court correctly chose and applied the subjective standard of good faith, (2) full ownership rights to the vehicles passed to it as a BIOC, and (3) Vehicle Code section 5753 does not apply to the facts of this case.

## I. *Standard of Review*

■ To reach our destination of resolving this appeal, our journey requires the consideration of various provisions of the California Uniform Commercial Code and is guided by the applicable rules of statutory construction. The standards of review limit the paths open to us, as a court of review. For example, we may not resolve disputes of fact raised in connection with the application of legal standards derived from the California Uniform Commercial Code; the trier of fact must resolve those disputes. (See, e.g., *Martin Marietta Corp. v. N.J. Nat. Bank* (3d Cir. 1979) 612 F.2d 745, 753 [application of phrase "buys in ordinary course" remanded to trial court].) In addition, a trial court's explicit and implicit findings of fact in its statement of decision are reviewed under the substantial evidence standard. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792–793 [218 Cal.Rptr. 39, 705 P.2d 362] [implied findings]; see Code Civ. Proc., §§ 632, 634.)

■ In contrast to the deference given to the trial court as a finder of fact, we independently review the trial court's rulings on questions of law (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801 [35 Cal.Rptr.2d 418, 883 P.2d 960]), such as issues of statutory construction and the application of that construction to a set of undisputed facts. (*Twedt v. Franklin* (2003) 109 Cal.App.4th 413, 417 [134 Cal.Rptr.2d 740].)

## II. *Conflicting Claims to the Same Goods by a Secured Party and a Buyer*

### A. *General Rule Protecting Security Interests*

The California Uniform Commercial Code contained[8] a number of provisions that determined who would prevail in a conflict between the purchaser of goods and a secured party claiming an interest in the same goods.[9] As a general rule, a buyer of goods did not take free of a prior security interest. (§§ 9201, 9306, subd. (2).) This general rule was subject to exceptions.

---

[8] See footnote 1, *ante.*

[9] One of the functions of the Uniform Commercial Code (UCC) is to establish the rules for allocating losses between relatively innocent parties when the third party who caused the loss is no longer available or is insolvent. (E.g., *Gordon v. Hamm* (1998) 63 Cal.App.4th 1324, 1331 [74 Cal.Rptr.2d 631] [allocating loss occasioned by absent thief among parties not "morally blameworthy"].)

The general rule that a security interest continued in collateral despite its sale did not apply if the sale "was authorized by the secured party in the security agreement or otherwise . . . ." (§ 9306, subd. (2).) Valley has not argued that Auction authorized Pacific to sell the vehicles for purposes of section 9306. Consequently, we do not address the role, if any, of that section in this case.[10]

## B. *The Exception for a Buyer in the Ordinary Course of Business*

Another major exception to the general rule was set forth in section 9307, which provided in part: "(1) A buyer in ordinary course of business (subdivision (9) of Section 1201) takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

The definitions in section 1201 that were relevant to the application of section 9307 to the sale of the vehicles from Pacific to Valley included:

"(9) 'Buyer in ordinary course of business' means a person who, in good faith and without knowledge that the sale to him or her is in violation of the ownership rights or security interest of a third party in the goods, buys in ordinary course from a person in the business of selling goods of that kind, but does not include a pawnbroker. . . . 'Buying' may be for cash, or by exchange of other property or on secured or unsecured credit, and includes receiving goods or documents of title under a preexisting contract for sale, but does not include a transfer in bulk or as security for, or in total or partial satisfaction of, a money debt. [¶] . . . [¶]

---

[10] Valley did argue that Auction clothed Pacific with the apparent power to dispose of the vehicles for purposes of section 2403, but has not argued Auction impliedly authorized the sales for purposes of section 9306 based on (1) the terms of the agreements, such as the terms set forth in footnote 3, *ante*, and the financing statement's reference to the collateral as inventory, or (2) the conduct of Auction concerning prior sales. (See *Central Cal. Equip. Co. v. Dolk Tractor Co.* (1978) 78 Cal.App.3d 855, 860–862 [144 Cal.Rptr. 367] [discussing when an agreement's express prohibition on disposing of the collateral without written consent gives way to an implied authorization by the secured party to sell]; see also *Producers Cotton Oil Co. v. Amstar Corp.* (1988) 197 Cal.App.3d 638 [242 Cal.Rptr. 914].)

We make these observations and this digression concerning former section 9306 to explicitly define the limits of this opinion. In no event should practitioners or courts subsequently interpret this opinion as expressing any view on (1) whether the written terms of the various documents and conduct of the parties gave Pacific the authority, express or implied, to dispose of the vehicles prior to payment or (2) any proposition of law regarding former section 9306 (or its successor provision) or its interplay with former section 9307 (or its successor provision).

"(19) 'Good faith' means honesty in fact in the conduct or transaction concerned. [¶] . . . [¶]

"(25) [¶] . . . [¶] (c) . . . A person 'knows' or has 'knowledge' of a fact when he or she has actual knowledge of it."

The provisions of division 2 of the California Uniform Commercial Code that Auction contends are relevant to this appeal include the objective standard of good faith set forth in section 2103 and the BIOC provision contained in section 2403.[11] Section 2103 provided: "(1) In this division unless the context otherwise requires [¶] (a) 'Buyer' means a person who buys or contracts to buy goods. [¶] (b) 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

Section 2403, which contained the general rule that a purchaser of goods acquired all title that his or her transferor had the power to convey, provided in part:

"(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.

"(3) 'Entrusting' includes any delivery and any acquiescence in retention of possession for the purpose of sale, obtaining offers to purchase, locating a buyer, or the like; regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law."

The objective standard of good faith in section 2103 has been applied to determining whether a merchant was a BIOC for purposes of section 2403. (See *Mattek v. Malofsky* (1969) 42 Wis.2d 16 [165 N.W.2d 406] [used car dealer who bought car without obtaining certificate of title was not a BIOC under UCC § 2-403 ]; *Atlas Auto Rental Corp. v. Weisberg* (1967) 54 Misc.2d 168 [281 N.Y.S.2d 400] [merchant who paid $300 for car and sold it for $1,200 was not a BIOC under UCC § 2-403].) Whether the objective standard of good faith should have been applied to determine whether a merchant buyer was a BIOC for purposes of former section 9307 is one of the issues raised in this appeal.

---

[11] In its appellate brief, Valley also argued the relevance of section 2403 by stating that the "Float Program is exactly the type of transaction contemplated by Section 2403." Valley further argued Auction entrusted Pacific with the vehicles with the power to dispose of them and that by choosing to trust Pacific, Auction accepted the risk that Pacific might sell the vehicles out of trust.

### C. Statutory Construction of the Uniform Commercial Code

Generally, a reviewing court's "fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.]" (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) This task begins by scrutinizing the actual words of the statute, giving them their usual, ordinary meaning. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906].)

If the words of the statute do not provide an unambiguous answer to the question presented, "then we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' " (*Day v. City of Fontana, supra*, 25 Cal.4th at p. 272.)

The Legislature has directed that the California Uniform Commercial Code "shall be liberally construed and applied to promote its underlying purposes and policies." (§ 1102, subd. (1).)

#### 1. Actual words used do not resolve the issue

The words used in the statutory provisions involved here did not explicitly say whether a merchant buyer must act in accordance with reasonable commercial standards to achieve BIOC status under section 9307.

First, the phrase "buys in ordinary course" used in section 1201, subdivision (9) to define BIOC was not itself defined, and the usual, ordinary meaning of "ordinary course" does not resolve whether reasonable commercial standards are inherent in the concept of what is ordinary between merchants.

Second, incorporation of the subjective good faith standard into section 9307 was not explicitly required by the words of the statute. The subjective good faith standard was adopted by courts based on deductions made from the general language and the structure of the Uniform Commercial Code. (See, e.g., *Martin Marietta Corp. v. N.J. Nat. Bank, supra*, 612 F.2d at pp. 751–753; see also pt. II.D.1., *post*, regarding the subjective-objective split over good faith.) We recognize that these deductions produced a viable construction of the statute, but we conclude the inquiry does not end there. In accordance with subdivision (1) of section 1102, the construction of both the

good faith requirement and the ordinary course requirement must be tested against the "underlying purposes and policies" of the California Uniform Commercial Code.

### 2. *Legislative history does not provide an explicit answer*

The parties did not cite any legislative history or comments to the California Uniform Commercial Code that addressed whether section 9307 or the definition of BIOC required a merchant buyer to adhere to reasonable commercial standards. (See *Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1239 [8 Cal.Rptr.2d 298] [asserting the second step of statutory construction is the consideration of legislative history].) Nor has our own research uncovered an explicit answer in the legislative materials.

### 3. *Purposes and policies*

Because of the lack of specific legislative guidance, we turn to the general purposes and policies underlying the UCC as well as the specific policies underlying the provisions relevant to this appeal. (See § 1102, subd. (1).) We recognize that in the context of the UCC, "[c]onstruction and application are intellectually impossible except with reference to some reason and theory of purpose and organization. . . ." (Alces & Frisch, *Commenting on "Purpose" in the Uniform Commercial Code* (1997) 58 Ohio St. L.J. 419, quoting Karl N. Llewellyn.)[12]

At the most general level, the purposes and policies of the California Uniform Commercial Code are "(a) [t]o simplify, clarify and modernize the law governing commercial transactions; [¶] (b) [t]o permit the continued expansion of commercial practices through custom, usage and agreement of the parties; [and] [¶] (c) [t]o make uniform the law among the various jurisdictions." (§ 1102, subd. (2).) At the more specific level of division 9 of the California Uniform Commercial Code, the aim "is to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greater certainty." (Official Comments on U. Com. Code, 23C West's Ann. Cal. U. Com. Code (1990 ed.) foll. former § 9101, p. 289.) Finally, at the statutory level, section 9307 attempted to achieve the stated aim by striking a balance between protecting security

---

[12] Professor Llewellyn was appointed Chief Reporter of the UCC in 1944 and was a member of the subcommittee that considered article 2 in the work leading to the 1958 edition. He has been described as "the father of the Uniform Commercial Code" (*La Sara Grain v. First Natl. Bank of Mercedes* (Tex. 1984) 673 S.W.2d 558, 565, fn. 4) and "the dominating force behind the drafting of the Uniform Commercial Code" (Abyad, *Commercial Reasonableness in Karl Llewellyn's Uniform Commercial Code Jurisprudence* (1997) 83 Va. L.Rev. 429).

interests and providing for the merchantability of goods. (Compare *Foy v. First Nat. Bank of Elkhart* (7th Cir. 1989) 868 F.2d 251, 255 [a purpose of UCC § 9-307 is to protect security interests] with *Riverside Nat. Bank v. Law* (1977) 1977 OK 84 [564 P.2d 240, 242] [UCC § 9-307 promotes the UCC's aim of facilitating the merchantability of property]; see Waldrep, *Sections 9-307(1) and 1-201(9) of the Uniform Commercial Code: The Requirement of Buying From a Person in the Business of Selling Goods of That Kind (1983) 58 Ind. L.J. 335, 338–340 [discussing conflicting policies underlying the BIOC rule].)*

After considering the foregoing, we conclude the ultimate goal of the California Uniform Commercial Code is to set forth rules of law that promote the optimal allocation of society's resources, i.e., promote economic efficiency. In the context of the used car industry, the goal can be restated as making vehicles available to consumers as efficiently as possible. Accordingly, the competing rules of law advocated by the parties must be considered in terms of which rule best serves this goal.

Having identified the goal of our statutory construction, we now examine how other courts have analyzed section 9307 and the issues of good faith and ordinary course contained in the definition of BIOC.

D. *The Debate Over the Good Faith Standard*

Professors White and Summers, leading commentators on the UCC, have addressed the application of section 9307 and the definition of BIOC to disputes between a buyer and a perfected secured creditor. (White & Summers, Uniform Commercial Code (5th ed. 2002) § 33-8, pp. 311–317 (White & Summers).) Part of their discussion of section 9307 states:

"That the buyer must purchase in 'good faith' and 'without knowledge that the sale to him is in violation of the * * * security interest of a third party' may cause uncertainty. Exactly what the good faith requirement adds is unclear. Also, the requirement that the buyer have no knowledge may seem to conflict with the words of 9-[307(1)], which permits the buyer to take free even though the buyer 'knows of [the security interest's] existence.' On careful reading the two requirements do not conflict. The buyer fails to qualify under 9-[307(1)] only if buyer knows that the sale is 'in violation' of the security interest. Normally a lender with a security interest in inventory intends the debtor to be able to sell the inventory free and clear. Thus, it is perfectly consistent for a buyer to know of a security interest but to believe the sale is not in violation of that interest. Comment 3 to 9-[307] explains: [¶] 'Reading the definition together with the rule of law results in the buyer's taking free if the buyer merely knows that a security interest covers the goods

but taking subject if the buyer knows, in addition, that the sale violates a term in an agreement with the secured party.' " (White & Summers, *supra*, § 33-8, pp. 315–316, fns. omitted.)

In this appeal, the "without knowledge" requirement is not an issue. Auction concedes the trial court's finding that Valley did not know Pacific was selling the vehicles out of trust was supported by substantial evidence.

1. *The subjective-objective split among jurisdictions over good faith*

The lack of clarity referenced by Professors White and Summers concerning the good faith requirement had at least three sources. First, authorities were split over whether merchant buyers are subject to the honesty in fact standard contained in section 1201, subdivision (19), or to the stricter standard of good faith contained in section 2103, subdivision (1)(b), which required both honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade. (See White & Summers, *supra*, § 33-8, p. 315, fn. 9.)[13]

The subjective standard was adopted by a majority, and the objective standard by a minority, of jurisdictions. (Compare *Martin Marietta Corp. v. N.J. Nat. Bank, supra*, 612 F.2d at pp. 751–753; *Frank Davis Buick v. First Alabama Bank* (Ala.Civ.App. 1982) 423 So.2d 855; *Franklin v. First Nat. Bank* (Wyo. 1993) 848 P.2d 775; *Sea Harvest, Inc. v. Rig & Crane Equip. Corp.* (1981) 181 N.J.Super. 41, 48–50 [436 A.2d 553, 557–558]; *Massey-Ferguson, Inc. v. Helland* (1982) 105 Ill.App.3d 648, 651–655 [434 N.E.2d 295, 297–299, 61 Ill.Dec. 142]; *Sherrock v. Commercial Credit Corp.* (Del. 1972) 290 A.2d 648, 651; with *Swift v. J.I. Case Co.* (Fla.Dist.Ct.App. 1972) 266 So.2d 379, 381; *Hempstead Bank v. Andy's Car Rental Sys.* (1970) 35 A.D.2d 35, 37–38 [312 N.Y.S.2d 317, 320]. See also *John Deere Co. v. Jeff DeWitt Auction Co.* (Mo.Ct.App. 1985) 690 S.W.2d 511, 515 [expressing a preference for the objective standard in dictum].) Professors White and Summers appear to support imposing the stricter standard of good faith on merchants. (See White & Summers, *supra*, § 33-8, p. 315, fn. 9 [terming Chief Justice Wolcott's dissent in *Sherrock v. Commercial Credit Corp, supra*, 290 A.2d 648, as "sound"].) The issue is one of first impression in California.

---

[13] Under the current version of the California Uniform Commercial Code, division 9 has its own definition of good faith, which includes the objective standard. (See current § 9102, subd. (a)(43).) Consequently, incorporation of the objective standard from division 2 is not an issue under the current version.

### 2. *Relationship between good faith and without knowledge requirement*

In addition to this split of authority, a second reason for the lack of clarity in the good faith requirement in the definition of a BIOC was that some courts viewed the requirement as merging with the "without knowledge" requirement also contained in that definition. (See *Foy v. First Nat. Bank of Elkhart* (N.D.Ind. 1988) 693 F.Supp. 747, 756, fn. 24, affd. (7th Cir. 1989) 868 F.2d 251.)

### 3. *Relationship between good faith and ordinary course*

A third reason for the lack of clarity in the good faith requirement was the interrelationship between good faith and buying in the ordinary course. The Third Circuit Court of Appeals said that the issues of good faith and buying in the ordinary course, though analytically distinct, were determined in part by intertwining answers. (See *Martin Marietta Corp. v. N.J. Nat. Bank, supra,* 612 F.2d at p. 753.) Furthermore, the Third Circuit indicated the meaning of the phrase "buys in ordinary course" was uncertain: "[I]t is unfortunate that the Code defines 'buyer in ordinary course' in part by using the exact words to be defined. By saying that a buyer in ordinary course is one who buys in ordinary course, the phrase seems redundant and thus meaningless." (*Ibid.*)[14]

The Third Circuit then observed that the New Jersey courts had not addressed the meaning of the phrase "buys in ordinary course" and the precise question whether that phrase had meaning independent of the other elements in the BIOC definition. (*Martin Marietta Corp. v. N.J. Nat. Bank, supra,* 612 F.2d at p. 753.) The Third Circuit held the phrase had independent meaning and required some inquiry into the nature of the transaction; it remanded the matter to the district court to consider in the first instance whether the transaction was in the ordinary course. (*Ibid.*)

The relationship between good faith and ordinary course caused the Seventh Circuit Court of Appeals to state that the debate over whether the

---

[14] This redundancy has been cured in the current version of subdivision (9) of section 1201 which added a sentence explaining what it means to buy "in the ordinary course." Professor Harrell states the revision "may loosen up the definition of BIOCOB just a bit by requiring the sale to comport with either the seller's customary and usual practices or customary practices in the seller's industry. . . . [T]he sale will be covered as an 'ordinary course' sale even if it is an unusual transaction for the seller, so long as it comports with industry standards (or conversely, if it comports with the seller's usual practices even if outside normal industry standards)." (Harrell, *Oil and Gas Finance Under Revised UCC Article 9* (2001) 33 Tex. Tech L.Rev. 31, 43, fns. omitted.) How this new definition interacts with the observance of reasonable commercial standards required by the objective standard of good faith included in the current version of division 9 (see fn. 13, *ante*) is a question for a later day.

subjective or objective standard of good faith should be used in determining whether a buyer was a BIOC "may be much ado about nothing" because a reasonableness standard may already exist in the concept of "ordinary course." (*Foy v. First Nat. Bank of Elkhart, supra*, 868 F.2d at p. 256.) In particular, Judge Posner suggested the "ordinary course" requirement "seems equivalent to requiring that the buyer be acting reasonably in agreeing to a method of dealing proposed by the seller." (*Ibid.*) In connection with the analysis of "ordinary course," Judge Posner specifically addressed the issue of "whether a method of selling vans that necessitates delay in the delivery of the certificate of origin has the sort of odor about it that, as a matter of law, takes it out of the ordinary course." (*Id.* at p. 255.) The issue was decided against the secured party because it "failed to make a case" that "a dealer's failure to insist that his supplier forward the certificate with the vehicle (or immediately afterward) is not in the ordinary course of business." (*Foy, supra*, at p. 256.)

### E. *Choosing Among the Approaches*

Existing case law provides three approaches to resolving the question whether a merchant buyer of used cars must observe reasonable commercial standards to qualify as a BIOC for purposes of section 9307: (1) the majority view requiring only subjective good faith; (2) the minority view requiring objective good faith; and (3) the view suggested in *Foy* that reasonable commercial standards were inherent in the concept of the ordinary course of business between merchants.[15]

As discussed above, we must adopt a rule of law that best serves the ultimate purpose of economic efficiency, which means making vehicles available to consumers as efficiently as possible. The parties do not disagree with the ultimate goal of economic efficiency, but dispute the means for achieving this end. Auction contends that protecting the secured party will promote the availability of financing, which in turn will allow businesses in the used car industry to operate at a lower cost and handle a greater volume

---

[15] For scholarly discussion, see White and Summers, *supra*, section 33-8; Hawkland, Uniform Commercial Code Series (2002) section 9-320:2 (rev. art. 9); Anderson on the Uniform Commercial Code (2003) sections 1-201:40 to 1-201:142 (BIOC), section 2-401:31 (title certificates), section 2-403:101 (when certificate of title is essential to transfer of title), sections 9-307:5 to 9-307:14 (BIOC), section 9-320:4R-9R (BIOC under rev. art. 9); Billings, Floor Planning, Retail Financing, and Leasing in the Automobile Industry, *supra*, sections 5:38, 5:39 (effect of buyer's failure to obtain certificate of title); Epling, *Priorities Disputes in Motor Vehicles and in Other Certificated Goods* (1986) 41 Business Lawyer 361; Peltier, *Buyers of Used Goods and the Problem of Hidden Security Interests: A New Proposal to Modify Section 9-307 of the Uniform Commercial Code* (1985) 36 Hastings L.J. 215, 219–220, footnote 25. See also Krahmer, *Cars, Boats, and Security Interests: Certificates of Title and the Uniform Commercial Code* (1994) 48 Consumer Fin. L.Q. Rep. 149.

of vehicles. Valley contends that if retailers must wait until the wholesaler has title to a vehicle before it is safe to purchase the vehicle, fewer sales will be completed and the ones that are completed will take more time and be less efficient, i.e., fewer used vehicles will be made available to consumers at a greater cost.

When an appellate court is required to choose between the competing means for achieving the end of economic efficiency, it is faced with a question more complex than simply determining if a trial court's findings on historical facts are supported by substantial evidence and then applying a legal standard to those facts. Instead, the choice involves predicting how a particular rule of law would affect the conduct of people in the industry and estimating the various costs associated with that conduct.[16]

In performing this forward-looking inquiry in the consumer context, courts generally presume that requiring only subjective good faith from a consumer reduces transaction costs and promotes efficiency by allowing the consumer to purchase goods without incurring the costs of an investigation he or she is ill equipped to perform efficiently.[17] (See *Prenger v. Baker* (Iowa 1995) 542 N.W.2d 805, 808–809; see generally Anderson on the Uniform Commercial Code, *supra*, § 9-320:4R.)

In the context of merchants dealing in used cars, the issue of economic efficiency can be restated as whether the incremental burden of requiring merchant buyers to act in accordance with reasonable commercial standards would add more transaction cost to used car sales than the incremental burden of requiring secured parties to guard against, or bear the losses occasioned by, modes of dealing between their borrowers and merchant buyers that fail to meet reasonable commercial standards.

Because we do not have (1) a model for predicting how the industry participants would react to the alternative legal standards or (2) a wealth of empirical data about the costs associated with the possible reactions, we must forge ahead using the tools at our disposal. The most practical tools are the fundamental ideas that (1) market forces cause commercial standards to

---

[16] The question of what affect a rule will have on the future is an ex ante or forward-looking inquiry. Reviewing findings of fact for substantial evidence is an ex post or backward-looking inquiry. (See Solum, Legal Theory Lexicon 001: Ex Ante/Ex Post <http://legaltheorylexicon.blogspot.com/2003_09_01_legaltheorylexicon_archive.html> [as of June 25, 2004].)

[17] Auction distinguishes sales between merchants from sales to consumers by asserting that if Pacific had sold the vehicles to consumers instead of a merchant, the consumers would have taken free of its security interest because consumers need only meet the subjective good faith requirement, and consumers may buy in the ordinary course from a retailer's inventory without demanding delivery of the certificate of title at the time of payment.

gravitate towards efficient modes of dealing and (2) rules that are consistent with one another produce greater certainty and thus are more efficient than rules that are inconsistent.

Used together, these ideas lead to the conclusion that the additional burden of requiring merchant buyers to act in accordance with reasonable commercial standards represents a lesser imposition on the chain of commerce than the burden of requiring secured parties to bear the losses arising from the failure of merchant buyers to observe reasonable commercial standards in their mode of dealing with sellers.

Application of the idea of consistency is illustrated by the hypothetical situation where (1) some of the cars sold to Valley by Pacific were acquired from Auction and other cars were acquired from an owner-consignor who had entrusted the cars to Pacific and (2) Valley was ignorant of the source of the cars, or at least was not able to distinguish which cars came from which source. If Pacific did not pay off the consignor or Auction and Valley sued both of them to obtain the certificates of title, should Valley's claim to BIOC status be subject to different legal standards based on where its seller got the vehicles? Because Valley's rights against the consignor are determined by application of the BIOC requirement in section 2403, and its rights against Auction are determined by the BIOC requirement in section 9307, then different legal standards would apply unless reasonable commercial standards are part of the latter BIOC requirement.

This hypothetical situation shows that the incremental burden of requiring a merchant buyer to adhere to reasonable commercial standards to take free of a security interest may not be significant because that burden already is imposed on the merchant buyer who wishes to take free of an ownership claim by a consignor. If the merchant buyer lacks information about how the seller acquired the vehicles, then the merchant buyer must observe reasonable commercial standards or risk losing the vehicle to a consignor.

■ In summary, we hold that for purposes of former section 9307 a merchant buyer must observe reasonable commercial standards to attain the protection of BIOC status. We do not explicitly decide whether this requirement is part of the good faith standard or is inherent in the concept of "ordinary course" because that issue makes little difference in this case and this decision will have limited application to other disputes currently in litigation since the statutory provisions involved were replaced effective July 1, 2001.[18] Were it otherwise, we would be more inclined to decide explicitly

---

[18] Notwithstanding the limited application of this opinion as controlling precedent, we publish this decision because the issues raised regarding former section 9307 and Vehicle Code former section 5753 are issues of first impression.

whether reasonable commercial standards were part of the good faith requirement or part of the ordinary course requirement.

### III. *Determining Reasonableness on the Appellate Record*

The trial court applied legal standards that did not address, either under the concept of good faith or the concept of ordinary course, whether Valley's mode of dealing with Pacific met reasonable commercial standards. This was legal error, and Auction sufficiently preserved the issue for appeal by arguing that reasonable commercial standards should have been applied through the good faith requirement.

Consequently, our next step is to decide whether the reasonableness of Valley's conduct under commercial standards can be resolved on the record before us or whether this case should be remanded to the trial court for further proceedings. (Compare *Foy v. First Nat. Bank of Elkhart, supra*, 868 F.2d at pp. 255–256 [remand not necessary] with *Martin Marietta Corp. v. N.J. Nat. Bank, supra*, 612 F.2d at pp. 753–754 [remand to district court to determine the close question of whether the acquisition fell inside or outside the ordinary course].)

### A. *Reasonable Commercial Standards Present a Question of Fact*

■ Generally, questions of reasonableness are regarded as questions of fact or mixed questions of law and fact. (See *Schwartz v. Helms Bakery Limited* (1967) 67 Cal.2d 232, 237, fn. 3 [60 Cal.Rptr. 510, 430 P.2d 68] [in the tort context, reasonableness is a mixed question of law and fact traditionally answered by juries].) Similarly, "courts generally treat commercial reasonableness as a question of factual determination for the jury, although some courts view it as a mixed question of law and fact." (Abyad, *Commercial Reasonableness in Karl Llewellyn's Uniform Commercial Code Jurisprudence, supra*, 83 Va. L.Rev. at p. 451, fns. omitted.) In addition, "the question whether a buyer is in the ordinary course of business is indeed one of fact for purposes of appellate review." (*Foy v. First Nat. Bank of Elkhart, supra*, 868 F.2d at p. 254; see Anderson on the Uniform Commercial Code, *supra*, § 1-201:56.)

Therefore, if the record contains conflicting evidence on the issue whether Valley's conduct met reasonable commercial standards, we will not resolve the issue as a matter of law, but will remand to the trial court.

## B. *Vehicle Code's Effect on Pacific's Sales to Valley*

Auction contends that as a matter of law, Valley is not a BIOC because (1) Valley's transactions with Pacific violated Vehicle Code section 5753, (2) such a violation was designated as a misdemeanor by the version of Vehicle Code section 40000.7, subdivision (a)(13) in effect at the time,[19] and (3) a buyer who participates in an illegal transaction is not protected by BIOC status.[20] Valley disagrees and argues that there was no violation of Vehicle Code section 5753 because, among other things, the statute did not specify the amount of time in which the certificates of title were to be delivered.

These conflicting views about whether Vehicle Code section 5753 was violated require us to construe and apply that statutory provision to the facts of this case. We apply the usual rules of statutory construction and begin our analysis with the actual words of the statute. (See *Day v. City of Fontana, supra,* 25 Cal.4th at p. 272 [setting forth the usual rules of statutory construction].) Vehicle Code section 5753 provided: "It is unlawful for any person to fail or neglect properly to endorse, date, and deliver the certificate of ownership and, when having possession, to deliver the registration card to a transferee who is lawfully entitled to a transfer of registration. Except when the certificate of ownership is demanded in writing by a purchaser, a vehicle dealer licensed under this code shall satisfy the delivery requirement of this section by submitting appropriate documents and fees to the department for transfer of registration in accordance with Sections 5906 and 4456 of this code and rules and regulations promulgated thereunder."

### 1. *Auction has not shown a violation of Vehicle Code section 5753*

First, we construe the statutory language to mean that the certificate of ownership for a vehicle was required to be delivered "to a transferee who [wa]s lawfully entitled to a transfer of registration." In other words, the quoted prepositional phrase related to both (1) the delivery of the certificate of ownership and (2) the delivery of the registration card. This prepositional

---

[19] This version was effective until January 1, 2001. In the current version of Vehicle Code section 40000.7, violations of section 5753 are addressed in subdivision (a)(12).

[20] Auction's contention is similar to the reasoning adopted by the Ninth Circuit Court of Appeals in a case where a merchant purchased cattle and failed to comply with the Washington state brand statute. (*Rudiger Charolais Ranches v. Van De Graaf Ranches* (9th Cir. 1993) 994 F.2d 670.) In that case, a merchant buyer took delivery of cattle and paid for them without obtaining the brand release documents required by statute. The Ninth Circuit held as a matter of law that the buyer did not comply with "reasonable commercial standards" even though he acted honestly and according to the standards of the trade. The court reasoned that the statute adopted by the state Legislature established the reasonable commercial standard, and custom of the trade was no longer reasonable under that standard. (*Id.* at p. 673.)

phrase was worded exactly the same as in the predecessor statute, former section 176 of the Vehicle Code, and the predecessor only addressed delivery of the certificate of ownership.[21] There is nothing to suggest that when the Legislature added the delivery of the registration card to the text of the statute, it intended to change the person to whom the certificate of title was to be delivered. Furthermore, if the Legislature had intended such a significant change, it would have included some criteria for identifying the person to whom the certificate of title should have been delivered. Therefore, we conclude that Vehicle Code section 5753 was violated by any person who failed to deliver a certificate of title "to a transferee who [wa]s lawfully entitled to a transfer of registration." We recognize that the foregoing construction may seem simplistic and overly didactic, but it is a necessary step in evaluating Auction's contention that the sale from Pacific to Valley actually violated Vehicle Code section 5753.

Based on this statutory construction, Auction can establish an actual violation of Vehicle Code section 5753 only if it shows that Valley was "a transferee who [wa]s lawfully entitled to a transfer of registration" for purposes of the statute. Vehicle Code section 5753 did not specify the circumstances that "lawfully entitled" a buyer to delivery of the certificate.[22] As a result, Auction's argument presents a chicken-or-egg problem. Auction claims Valley was not a BIOC because the statute was violated. Yet, the section was not violated unless Valley was "lawfully entitled" to delivery of the certificates of title. In turn, whether Valley was lawfully entitled to the certificates depended upon whether Valley was a BIOC. Stated otherwise, only after a court determined which party was lawfully entitled to the certificates of title could it determine if Vehicle Code section 5753 was violated. Thus, the purported violation of that section is not helpful in determining the fundamental dispute of this litigation—who was entitled to the certificates.

Our view that a violation of Vehicle Code section 5753 can be identified only after deciding who had the superior claim to the vehicles is further illustrated by how easily the statutory language can be turned against Auction if one has decided that Valley was entitled to the certificates. The statutory language made it unlawful for "any person" to fail to deliver a certificate of title to a transferee entitled to it. If Valley was a BIOC or Auction impliedly authorized the sale of the vehicles, then Auction may have been a "person" who acted in violation of that statutory requirement by failing to deliver the

---

[21] Former section 176 of the Vehicle Code stated: "It is unlawful for any person to fail or neglect properly to endorse and deliver the certificate of ownership to a transferee who is lawfully entitled to a transfer of registration." (Stats. 1935, ch. 27, p. 115.)

[22] In addition, the statute did not say *when* delivery was to occur. The current version of Vehicle Code section 5753 requires the delivery of the certificate of title within 15 days in certain situations.

certificates of title to Valley. (Cf. *Foy v. First Nat. Bank of Elkhart, supra,* 868 F.2d at p. 257 [observing the argument could be made that by holding the certificates, the secured party was an accomplice to the alleged violation of Indiana statute].)[23] Thus, instead of being protected by the statute, Auction might have violated it.

### 2. *Vehicle Code section 5753 did not protect secured parties*

Second, Auction's argument may be that even if an actual violation is not established, the provisions of Vehicle Code section 5753 nevertheless informed merchant buyers that a lawful transaction required the delivery of the certificate of title and, therefore, merchant buyers should have handled their transactions in a way that would have assured compliance with the statute, i.e., the buyer should not have parted with money until the certificate was delivered. Under this view of the statute, the buyer shared responsibility for the seller's noncompliance with the delivery requirement and a third party could use the statute to invalidate the buyer's claim to the vehicle. (Cf. *Sevier v. Roberts* (1942) 52 Cal.App.2d 403 [126 P.2d 380] [in a dispute between buyer and seller, failure to deliver certificate may not be used against buyer].)

As discussed *post*, we reject this position because (1) it was not required by the words used in Vehicle Code section 5753 or its underlying purpose, (2) it is not supported by relevant case law, and (3) its acceptance would create an anomaly with the California case law applying Vehicle Code section 5600.

The text of Vehicle Code section 5753 did not say that failure to deliver a certificate of ownership caused the attempt to transfer title to the vehicle to be ineffective, voidable or illegal.[24] The illegality described in the statute concerns only the failure to deliver the certificate or registration, not the sale itself. Thus, Auction's view that the consequences resulting from the lack of delivery of a certificate of title invalidate a buyer's claim was not required by the language of the statute. (See *Henry v. General Forming, Ltd.* (1948) 33 Cal.2d 223, 226–227 [200 P.2d 785] [creditor of the transferor of vehicle did not have rights superior to buyer who held equitable but not legal title].) Furthermore, Auction has not cited any legislative history or other California authority that would compel us to infer that result was intended by the Legislature or was consistent with the underlying purpose of the statute.

---

[23] In *Foy*, the court observed that Indiana's statute concerning the delivery of certificates was intended to protect purchasers, not secured parties, and it would be a considerable paradox to construe to statute so a secured party could use it to defeat a purchaser's claim. (*Foy v. First Nat. Bank of Elkhart, supra,* 868 F.2d at p. 257.)

[24] In contrast, Vehicle Code section 5600 says any attempted transfer shall not be effective until the transferor endorses and delivers the certificate of ownership.

(*Stoddart v. Peirce* (1959) 53 Cal.2d 105, 117 [346 P.2d 774] [purpose of former Veh. Code, § 176, the predecessor of Veh. Code, § 5753 and related statutory provisions, was to protect innocent purchasers and to allow identification of vehicles and of persons responsible in cases of accident and injury].)

As to the case law relied upon by Auction, those decisions involve statutes from other states that have been construed more strictly than California's Vehicle Code and, therefore, the decisions are not relevant to the application of California's statute. For example, the case of *Bank One Texas N.A. v. Arcadia Financial Ltd.* (5th Cir. 2000) 219 F.3d 494 involved the Texas Certificate of Title Act, which has been construed to mean that the sale of a vehicle is not complete until the title document has been delivered. Therefore, individuals who paid the dealership for a vehicle and did not receive a title document were not parties to a legal sale. (*Id.* at pp. 497–498.) Because no legal sale had been completed, the court held that the floor plan financier's perfected security interest in the vehicles continued without interruption. The approach of California courts to the question of whether a violation of the Vehicle Code renders a sale ineffective differs from the way Texas courts apply the Texas Certificate of Title Act.

"It has long been established [in California] that a transfer of the roperty interest in a motor vehicle is effective as between the immediate parties even though they have not complied with the registration statute. (*Kenny v. Christianson* (1927) 200 Cal. 419, 423 [253 P. 715, 50 A.L.R. 1297]; *Henry v. General Forming, Ltd.*[, *supra*,] 33 Cal.2d 223, 226 [200 P.2d 785].)" (*Security Pacific Nat. Bank v. Goodman* (1972) 24 Cal.App.3d 131, 136 [100 Cal.Rptr. 763].)[25]

Consequently, decisions from jurisdictions where courts strictly construed the state statute governing the delivery of certificates of title and held that the failure to obtain a certificate of title precludes the buyer from attaining BIOC status are contrary to California's approach to the Vehicle Code. (See *Saturn of Kings Automall v. Albert Leasing* (2001) 92 Ohio St.3d 513 [2001 Ohio 1274, 751 N.E.2d 1019] [certificate of Motor Vehicle Title Law control over UCC in resolving competing claims of ownership and title to cars]; *Bank One Texas N.A. v. Arcadia Financial Ltd.*, *supra*, 219 F.3d 494; *Ellsworth v. Worthey* (Mo.Ct.App. 1981) 612 S.W.2d 396 [applying Kansas law, if a

---

[25] See also *In re Laguna Beach Motors, Inc.* (Bankr. 9th Cir. 1992) 148 B.R. 322, 325–326; accord, *Dugdale of Nebraska v. First State Bank* (1988) 227 Neb. 729 [420 N.W.2d 273] (applying Nebraska statutes, a dealer's lender was bound to deliver title to any vehicle sold to a BIOC under UCC § 2-403).

certificate of title is not received, the buyer has not acted in good faith]; *Guy Martin Buick, Inc. v. Colorado Springs Nat. Bank* (1974) 184 Colo. 166 [519 P.2d 354] [under Colorado's Certificate of Title Act the purchaser of a vehicle does not receive any right, title or interest in vehicle until certificate of title is delivered]. See generally Billings, Floor Planning, Retail Financing, and Leasing in the Automobile Industry, *supra*, § 5:26 [title and ownership distinguished].)

Auction's position also is flawed because, if accepted, it would create an anomaly between Vehicle Code sections 5753 and 5600. A comparison of those sections begins with where they are located within the structure of the Vehicle Code. Both sections are part of chapter 2 of division 3 of the Vehicle Code. Division 3 of the Vehicle Code is labeled "Registration of Vehicles and Certificates of Title."[26] Chapter 2 of division 3, "Transfers of Title or Interest," contains five articles; the first article is labeled "Procedure to Transfer" (Veh. Code, § 5600 et seq.) and the second article is labeled "Endorsement and Delivery of Documents" (*id.*, § 5750 et seq.).

Vehicle Code section 5600 addresses the requirements for the transfer of vehicles by providing that "[n]o transfer of the title or any interest in or to a vehicle registered under this code shall pass, and any attempted transfer shall not be effective, until" either (1) the transferor has endorsed and delivered the certificate of ownership to the transferee and the transferee has submitted the appropriate paperwork and fee to the California Department of Motor Vehicles (DMV) or (2) the transferor sends the appropriate documents directly to the DMV.

Despite the mandatory language of Vehicle Code section 5600 and its predecessors, it has not been construed to mean that the requirements for the transfer of vehicles can be used to void a sale between a dealer and a buyer. (See *Security Pacific Nat. Bank v. Goodman*, *supra*, 24 Cal.App.3d at p. 136.) In contrast to the seemingly unconditional and definitive language in Vehicle Code section 5600 that an attempted transfer of a vehicle is not effective until the certificate of title is endorsed and delivered, Vehicle Code section 5753 states it is unlawful for any person to fail to deliver a certificate of title to a transferee lawfully entitled to it. Because California courts have rejected the use of Vehicle Code section 5600 by a third party to invalidate a sale between a buyer and a seller, it would be incongruous to hold that the weaker wording of Vehicle Code section 5753 can be used by Auction to invalidate the sale between Pacific and Valley, and it would be contrary to the underlying

---

[26] Division 3 is divided into six chapters that begin at section 4000 and end with section 9808 of the Vehicle Code.

statutory purpose of protecting innocent purchasers. Consequently, we construe Vehicle Code section 5753 to mean that the failure to deliver a certificate of ownership cannot be used by a secured creditor to void a sale between a dealer and a buyer.

■ In summary, we reject Auction's arguments that, as a matter of law, Vehicle Code section 5753 prevented Valley from attaining BIOC status and taking the vehicles free of Auction's perfected security interest.

### C. *Failure to Obtain Certificates of Title*

Auction also argues that Valley's purchases from Pacific were not in the ordinary course because Valley did not meet reasonable commercial standards when it failed to obtain the certificates of title to the vehicles when it paid Pacific. Valley contends that Auction failed to prove the reasonable commercial standards were not met.

The role played by certificates of title when a buyer claims BIOC status has been addressed by a number of courts and commentators. For example, Professor Billings stated: "Some courts regard a *dealer's* failure to obtain a certificate of title along with purchase of a used car as failure to observe reasonable commercial standards and have denied the dealer buyer in the ordinary course status." (Billings, Handling Automobile Warranty and Repossession Cases (2d ed. 2003) § 2:39, fn. omitted, italics added.) In an article not limited to merchant purchases from another merchant, one author has addressed disputes involving (1) a supplier versus the buyer from the dealer and (2) a floor planning lender versus the buyer from the dealer. (Epling, *Priorities Disputes in Motor Vehicles and in Other Certificated Goods, supra,* 41 Business Lawyer at pp. 364–369, 373–375 [generally a supplier or lender that retains certificates of title will lose to buyers from merchant dealers].)

### 1. *Risk and loss allocation*

Initially, we consider whether a risk analysis allows us to determine as a matter of law whether or not Valley acted in accordance with reasonable commercial standards. In some situations, the analysis of risk is straightforward and, as a result, the issue of reasonableness can be determined as a matter of law. Those situations arise when only one party's conduct created the risk, and the "courts [can] invoke[] the rule that where one of two innocent parties must suffer through the act of negligence or fraud of a third-party, the loss should fall upon the one whose conduct created the circumstances which enabled the third-party to perpetrate the wrong or cause the loss. [Citations.]" (*Martin v. Nager* (1983) 192 N.J.Super. 189, 206 [469 A.2d 519, 527]; see *Shuttie v. Festa Restaurant, Inc.* (Fla.Dist.Ct.App. 1990) 566

So.2d 554, 558 [secured lender had priority over consignor of paintings because consignor did not place a notation of ownership on paintings]; see generally Phillips, *The Commercial Culpability Scale* (1982) 92 Yale L.J. 228, 230, 251–263 [allocation of loss under UCC according to what author has labeled a "culpability scale" imposes the loss "on the party whose conduct created the highest level of risk, the same party who with least cost could have avoided loss"].)

In this case, the risks taken by Auction and Valley are similar in some respects. First, they both decided to do business with Pacific and Robert Huillier despite Robert Huillier's past criminal convictions. Second, they both decided to trust Pacific by transferring something of value to Pacific in exchange for Pacific's promise to fulfill a contractual obligation in the future. Auction transferred physical possession of vehicles to Pacific in exchange for the promise of Pacific to pay for those vehicles by honoring sight drafts when they were presented. Similarly, Valley transferred money to Pacific in exchange for physical possession of the vehicles and the promise that Pacific would deliver the certificates of title in the future. Third, both Auction and Valley took the risk that they understood the applicable law. Specifically, each assumed they would not bear the loss if Pacific was unable to perform its contractual obligations regarding payment or delivery of the certificates.

In other respects, the risks associated with the way Auction and Valley dealt with Pacific were not dissimilar. On one hand, Auction chose to sell to Pacific on credit and then increased that credit risk by allowing Pacific to pay using a draft. The processing of the draft took over 20 days and Auction could not be certain during this period whether Pacific would honor or dishonor the draft. The time it took to process the drafts allowed Pacific to obtain more vehicles from Auction and increased the amount of the loss.

On the other hand, Valley chose to deliver the purchase price for vehicles to Pacific before obtaining the certificates of title and waited as long as 60 to 90 days before obtaining those titles. The longer Valley was willing to wait, the more likely it became that Pacific would not or could not deliver the certificates of title and the larger the amount at risk became. In analyzing risk—which is distinct from outcome or the consequences of a decision—the fact that Valley purchased over 700 vehicles from Pacific does not necessarily imply that Valley's method of dealing with Pacific did not involve risk and therefore was commercially reasonable as a matter of law. It simply means that the risk inherent in the mode of dealing did not result in bad consequences in those transactions. The distinction between risk and outcomes can

be illustrated by an analogy to the game of Russian roulette. The fact that one successfully plays that game many times without suffering a bad outcome is not proof that the game is risk free for that player and therefore reasonable. Similarly, the fact that Valley received over 700 titles from Pacific does not mean that there was no risk that Pacific would not deliver the next title or that Valley was free of responsibility for the bad outcome once it occurred.

Accordingly, the appellate record shows that both Auction and Valley trusted Pacific and chose to deal with it in a way that increased the risks involved in the transactions. Therefore, the principle of allocating the loss to the party that created the risk cannot be applied to resolve, as a matter of law, whether Valley's actions met reasonable commercial standards.

### 2. *Evidence regarding the failure to obtain titles*

Valley argues the evidence shows that title follows the transaction in the used car industry, i.e., that merchants sell vehicles to other merchants and the certificates of title are delivered later. Auction contends Valley's argument ignores the critical relationship between when the money is delivered relative to the delivery of the certificate of title. For example, Auction acknowledges that it often sells vehicles on behalf of consignors and does not obtain the title document from the consignor until weeks after the sale, but Auction does not pay the consignor until it obtains the title document.

Conflicting testimony was presented to the trial court about whether it was ordinary or not for a car dealer to pay for an automobile without obtaining the certificate of title. For example, Eugene Robards, an expert called by Auction who spent 32 years with the DMV, testified that it was not accepted practice within the industry for a used car dealer to buy vehicles from a wholesaler without obtaining title documents. Robards also opined that the ordinary course of business in California is for a used car dealer to demand title when payment for the vehicle is made. Robards explained that part of the risk associated with not obtaining title at the time of payment is that the title could be held up if another dealer or financial institution is not paid off.

Rudolfo Castillo, the owner of a wholesale auto dealership, testified that in his dealings he does not pay for a car until he is given title, even though he may take possession of the vehicle and even transfer that vehicle to someone else before receiving title. Castillo pays for the car when he is provided with good title and then, if he has transferred possession of that car to another, he will take the certificate of title to, and receive payment from, that person. Castillo also testified that "99 percent of everybody I've ever talked to that's in the car business, the title is the key issue. So you do not pay for it until you have that so that you can get paid."

Kenneth Pearson, an automobile dealer who acts as a wholesaler and retailer, testified as an expert for Valley. Pearson testified that when he purchases a vehicle from a new car dealership or auction, he pays for the vehicle before he takes possession. Title to these vehicles is provided to Pearson anywhere from a couple of days to a month later. He is concerned about the subsequent delivery of the certificate of title, but he works trusting delivery will occur. There is not, according to Pearson, a standard in the automobile industry that requires wholesalers to present the certificate of title when they sell a car to a retailer. Pearson acknowledged in his testimony, however, that most dealers, including one to whom he sells cars, do have such a policy.

Our review of the testimony of the expert witnesses, and the inferences that could be drawn from that testimony, shows a conflict over what are the commercial standards for the delivery of certificates of title relative to the time of payment. We cannot resolve the conflict and determine as a matter of law whether Valley complied with commercial standards when it failed to demand title at or near the time it paid Pacific. Consequently, the trial court must weigh the evidence and make a finding of fact to resolve this issue.

### 3. *Reasonableness of the commercial standards*

Assuming that Valley's failure to require delivery of title at or near the time it paid for a vehicle fell within the range of commercial standards observed in the used car industry, the question becomes whether such a commercial standard was unreasonable as a matter of law. The reasonableness of industry practices are tested against the ultimate goal of economic efficiency and involve the consideration of all facts and circumstances related to that goal. The evidence presented does not compel the inference that a commercial standard that allowed Valley to pay for vehicles before receiving the certificates of title caused net inefficiencies to the chain of commerce to such a degree as to render that commercial standard unreasonable. Therefore, the issue of reasonableness must be resolved by the trial court.

### IV. *Conclusion*

On remand, the trial court has the discretion to decide what procedural steps will be taken to resolve this case. We express no view on whether the trial court should (1) hold a new trial, (2) reopen the record made during the first trial and receive additional evidence, (3) require only additional briefing, or (4) adopt an alternative procedure.

Assuming this case is decided under former section 9307 on remand, the trial court's decision as to whether Valley attained BIOC status will require it

to resolve the factual question whether Valley acted in accordance with reasonable commercial standards. The specific conduct at issue concerns Valley's decision not to obtain a certificate of title at or near the time of purchase of each vehicle.[27] The commercial standards relevant to the sale of vehicles from a wholesaler-merchant to a used car dealer-merchant should be established by expert testimony. If the trial court reaches the issue of the reasonableness of a commercial standard, expert testimony and the facts and circumstances related to the goal of achieving economic efficiency within the used car industry are relevant to that issue. Such facts and circumstances could include the alternatives open to each party and the relative "costs" of those alternatives. In this sense, "costs" would include financial outlays, expenditures of time, and uncertainties that might stifle the market.

## DISPOSITION

The judgment is reversed and the matter remanded for further proceedings. Costs are awarded to appellant.

Dibiaso, Acting P. J., and Vartabedian, J., concurred.

---

[27] The "without knowledge" requirement contained in the definition of a BIOC need not be revisited because the trial court's findings as to that requirement are supported by substantial evidence.