[No. G036228. Fourth Dist., Div. Three. May 31, 2007.]

QUARTZ OF SOUTHERN CALIFORNIA, INC., Plaintiff and Appellant, v. MULLEN BROS., INC., Defendant and Respondent.

[No. G036343. Fourth Dist., Div. Three. May 31, 2007.]

QUARTZ OF SOUTHERN CALIFORNIA, INC., Plaintiff and Respondent, v. MULLEN BROS., INC., Defendant and Appellant.

COUNSEL

Law Offices of Jeffrey B. McMillen and Jeffrey B. McMillen for Plaintiff and Appellant and for Plaintiff and Respondent.

Prenovost, Normandin, Bergh & Dawe, Thomas J. Prenovost, Jr., Paula M. Harrelson; Foell & Elder and William N. Elder, Jr., for Defendant and Respondent and for Defendant and Appellant.

OPINION

SILLS, P. J.—Quartz of Southern California, Inc. (Quartz), sold certain vehicles to a used car dealer, who sold the vehicles to consumers under conditional sale contracts. The dealer sold the contracts to Mullen Bros., Inc. (Mullen), a finance company, which paid the dealer in full. The dealer went out of business and failed to pay Quartz for the vehicles, so Quartz retained the title certificates. In these cross-actions between Quartz and Mullen, the

trial court issued a declaration that Quartz is the lawful owner of the title certificates but refused to order Mullen to pay Quartz for the certificates. Both Quartz and Mullen appeal.

We affirm that portion of the judgment declaring Quartz to be the lawful owner of the title certificates. However, we reverse the portion awarding no money to Quartz; we remand to the trial court for a calculation of the amount Mullen owes to Quartz.

## FACTS

Most of the facts in this case are undisputed. Quartz, doing business as Quartz Dealer Direct, is a licensed wholesale used auto auction. It acquires vehicles from licensed dealers and sells them to other licensed dealers at an auction sale. Quartz's practice is to accept vehicles from the selling dealers without a title certificate "because the title to the vehicle is mostly unavailable at the time that the selling dealer presents the vehicle for sale. That could be because of a lag in getting the payoff to the previous owner of title, but, in any event, the title is not required for the vehicle itself to go through the auction."

Quartz would generally require the buying dealer to pay for a vehicle before taking possession. With some dealers, however, Quartz had "a previous arrangement with that buying dealer to be able to leave the premise[s] with the vehicle based on a signature agreement to come back and pay for the title when it is available." In that case, the buying dealer would not be obligated to pay for the vehicle until Quartz received the title certificate from the selling dealer and contacted the buying dealer. Anthony Qualin, doing business as Mohawk Leasing (Mohawk), was a licensed used car dealer who had such an arrangement with Quartz.

Mohawk bought the 17 vehicles which are the subject of this dispute from Quartz and took possession without paying. With Quartz's knowledge, Mohawk sold each vehicle to a retail buyer as soon as possible after obtaining possession. Each buyer financed the purchase through a conditional sale contract. Mohawk then sold the contracts to Mullen, doing business as Mullen Finance Plan, which paid Mohawk the full amount of the agreed price.

Quartz paid its selling dealers for all 17 cars and received title certificates to each one. When it notified Mohawk that payment was due, it discovered Mohawk had gone out of business, leaving a debt to Quartz of $94,720. Quartz refused to release the title certificates to the retail buyers until Mullen paid Quartz on Mohawk's behalf. Mullen refused to pay Quartz but tried to

obtain duplicate title certificates for some of the retail buyers who had paid off their indebtedness. Mullen was partially successful; the Department of Motor Vehicles (DMV) issued duplicate title certificates to seven of the vehicles without procuring a release from Quartz, showing Mullen as legal owner. Subsequently, Quartz agreed to surrender the title certificate to each consumer who paid off his indebtedness while preserving its right to pursue a remedy against Mullen.

At trial, Quartz proceeded against Mullen and the DMV for declaratory relief and against Mullen for fraud on its second amended complaint. Mullen proceeded against Mohawk for negligent misrepresentation and breach of contract and against Quartz and the DMV for quiet title and declaratory relief on its first amended cross-complaint. Mohawk appeared and stipulated that it owed money to Quartz and it would indemnify Mullen if Mullen was ordered to pay anything to Quartz. Quartz stipulated it would not seek any monetary recovery from the DMV; in return, the DMV stipulated that it would "abide by the determination of this Court, respecting transfer of registration or title to the vehicle in question herein so long as all parties having an interest are properly given notice of this action. In addition, the DMV must receive the statutorily required documents and fees due in order to process said transfer . . . ."

Qualin testified that when Mohawk sold a vehicle to a retail buyer on credit, he wanted to sell the conditional sale contract to a lender as soon as possible. Some lenders insisted Mohawk have the title to a vehicle before they would pay for the contract. These lenders typically paid Mohawk the face value of the amount owing on the contract. Mullen, on the other hand, did not require title but discounted the value of the contract. "A discount is when a conditional sales contract has an unpaid . . . balance, meaning the balance that the customer owes plus interest, and the lender, instead of advancing that unpaid balance and making their profit off the interest, advances a lower figure, thereby increasing their profit." Consequently, Mullen was willing to buy contracts with "less creditworthy" customers. So Mohawk would go to Mullen if it did not have the title certificate and needed payment quickly or when it had a customer that the other lenders would not accept.

The court found, "MOHAWK created the problem by not paying Quartz when titles arrived. Quartz started the situation leading to this dilemma by giving possession of the motor vehicles to MOHAWK and not stopping MOHAWK from selling the cars to third persons (consumers) before the title arrived. Mullen should have waited for title to arrive before funding the loan but didn't, and thus acquired only what MOHAWK was able to provide as to title. In this case nothing. Mullen ·is now in the position of being an

unsecured creditor . . . . There was not fraud or illegal intent or actions on the part of Mullen as to Quartz."

The trial court framed the remaining issue as follows: "[W]hether or not, under the facts presented, MULLEN achieved the status of Buyer in the Ordinary Course and thus defeated the security interest of QUARTZ within the meaning of section 9320 of the Commercial Code." It found that Mullen did not act in "a 'commercially reasonable' manner when it funded the loans without at least verifying the right to title by MOHAWK before paying MOHAWK for the vehicles. . . . The record demonstrates that even the Department of Motor Vehicles cannot keep up with the volume and pace of cars moving through the industry. The amount of registration information required to be kept by the agency is staggering. When this is coupled with the number of cars being bought and sold every day and when one considers the number of times a particular car changes hands within days, it would be impossible for everyone in the chain to keep up. . . . [¶] It would have been simple to require MOHAWK, before getting paid, to provide information as to where MOHAWK got the motor vehicle and verify, as far as they needed to, that MOHAWK was entitled to title when it caught up. [¶] . . . MULLEN is NOT entitled to Buyer in the Ordinary Course Status."

The court issued a declaration that as between Quartz and Mullen, Quartz is the lawful holder of title to the disputed vehicles, but Quartz was awarded nothing further on its second amended complaint. The court awarded Mullen nothing against Quartz on its first amended cross-complaint, but ordered Mohawk to indemnify Mullen for "for any money due to [Quartz]." The judgment specifically recited that it "does not act as a declaration of the rights of the individual consumers involving their right to possession of, the registration to, the title to or any other right or interest the individual consumer might have involving a Motor Vehicle that they purchased from Mohawk and financed with Mullen that was the subject of this litigation."

Quartz appeals from the portion of the judgment stating that it take nothing further from Mullen on the complaint; it also seeks a declaration that the DMV should not have registered Mullen as the legal owner of any of the disputed vehicles. Mullen appeals from the portion of the judgment declaring Quartz the lawful holder of title to the vehicles.

## DISCUSSION

### Mullen's Appeal

Mullen contends the trial court erred by finding that Quartz retained title to the vehicles, arguing it failed to properly apply the provisions of the

California Uniform Commercial Code.[1] The question of title to the disputed vehicles rests on "statutory construction and the application of that construction to a set of undisputed facts." (*Brasher's Cascade Auto Auction v. Valley Auto Sales & Leasing* (2004) 119 Cal.App.4th 1038, 1048 [15 Cal.Rptr.3d 70] (*Brasher's*).) Accordingly, it is a question of law which we review independently from the trial court.

Mullen points out that vehicles qualify as "goods" (§ 2105, subd. (1)), and argues that the series of transactions here are governed by division 2 of the California Uniform Commercial Code—"Sales" (§§ 2101, 2102). Mullen reasons title to the vehicles passed under section 2401 when they were physically delivered to Mohawk, notwithstanding the lack of title certificates.[2] It then contends Mohawk had the power to transfer good title to the retail buyers under section 2403, notwithstanding Mohawk's failure to pay Quartz, because Quartz entrusted possession of the vehicles to Mohawk for purposes of sale.[3]

■ Mullen is wrong. Vehicles, although goods, are excluded from the scope of division 2 of the California Uniform Commercial Code because their sales are regulated by the Vehicle Code. Section 2102 provides that division 2 "does not . . . impair or repeal any statute regulating sales to consumers, farmers or other specified classes of buyers." The California Code comment explains, "This section would also exclude certain special statutes pertaining to sales to unique groups of buyers; for example, the provisions of the Vehicle Code relating to sale of and recording of sale of motor vehicles." (Cal. Code com., 23A pt. 1 West's Ann. Cal. U. Com. Code (2002 ed.) foll. § 2102 at p. 142.) The transfer of title to a vehicle registered in California is accomplished under Vehicle Code section 5600: "No transfer of the title or any interest in or to a vehicle registered under this code shall pass, and any attempted transfer shall not be effective, until the parties thereto have fulfilled either of the following requirements: [¶] (1) The transferor has made proper endorsement and delivery of the certificate of ownership to the transferee . . .

---

[1] All statutory references are to the California Uniform Commercial Code unless otherwise specified.

[2] Section 2401, subdivision (2) provides: "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place . . . ."

[3] Section 2403, subdivisions (2) and (3) provide: "(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business. [¶] (3) 'Entrusting' includes any delivery and any acquiescence in retention of possession for the purpose of sale, obtaining offers to purchase, locating a buyer, or the like; regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law."

and the transferee has delivered to the department . . . the certificate . . ."; or "(2) The transferor has delivered to the department . . . the appropriate documents for the registration or transfer of registration of the vehicle . . . ." (Veh. Code, § 5600, subd. (a).)

Mullen persists, contending that any rights Quartz had in the vehicles were cut off when Mohawk sold the vehicles to innocent consumers. Mullen points out the parties stipulated that the retail buyers are entitled to the title certificates without payment to Quartz when they pay off their conditional sale contracts. Thus, Mullen argues, the buyers had the power to grant security interests in the vehicles through the conditional sale contracts, which Mohawk assigned to Mullen. Mullen contends its interest in the conditional sale contracts is governed by division 9 of the California Uniform Commercial Code—"Secured Transactions"—because it purchased chattel paper (§ 9102, subd. (a)(11)) and by definition became a secured party (§ 9102, subd. (a)(72)).[4]

Again, Mullen is wrong. Vehicle Code section 6300 provides the exclusive method for perfecting a security interest in a vehicle not constituting inventory: "[N]o security interest in any vehicle registered under this code, irrespective of whether the registration was effected prior or subsequent to the creation of the security interest, is perfected until the secured party or his or her successor or assignee has deposited . . . with the department . . . a properly endorsed certificate of ownership to the vehicle subject to the security interest showing the secured party as legal owner . . . ."  The provisions of the California Uniform Commercial Code do not come into play to determine the rights of competing parties until the security interest is perfected under the Vehicle Code. (Veh. Code, §§ 6301, 6303.)

The trial court relied on *Brasher's, supra,* 119 Cal.App.4th 1038, when it analyzed whether Mullen's unsecured status would take precedence over what it characterized as Quartz's security interest. Brasher's, like Quartz, sold cars on consignment, and did not pay a consignor until after the vehicle was sold and the consignor delivered title documents to Brasher's. Brasher's sold 32 vehicles to Pacific, a used car wholesaler. Unlike Quartz, however, Brasher's extended financing to Pacific and perfected a security interest in the vehicles by filing a UCC-1 form "cover[ing] collateral that included inventories, whether 'now owned or hereafter acquired.' " (*Id.* at p. 1044.) Brasher's also obtained and held the certificates of title for the vehicles.

---

[4] Section 9102, subdivision (a)(11) defines " 'Chattel paper' " as "a record or records that evidence both a monetary obligation and a security interest in specific goods . . . ." Section 9102, subdivision (a)(72)(D) defines a " 'Secured party' " as "[a] person to which accounts, chattel paper, payment intangibles, or promissory notes have been sold."

Pacific sold the vehicles to Valley, a used car dealership, but failed to pay Brasher's. Subsequently, Brasher's filed a complaint for declaratory relief regarding its rights in the vehicles as against Valley. The trial court found that Valley was a buyer in the ordinary course of business and thus took title to the vehicles free of Brasher's security interest under former section 9307 (now § 9320). (*Brasher's, supra,* 119 Cal.App.4th at pp. 1046–1047.) The appellate court found "for purposes of former section 9307, a merchant buyer must observe reasonable commercial standards to attain the protection of [buyer in the ordinary course] status." (*Id.* at p. 1058.) The trial court had not addressed the question of whether Valley's conduct was commercially reasonable. Finding the issue was a question of fact, the appellate court remanded the case to the trial court for a factual determination. "The specific conduct at issue concerns Valley's decision not to obtain a certificate of title at or near the time of purchase of each vehicle." (*Id.* at p. 1069.)

The facts in *Brasher's,* however, differ significantly from those in this case. Quartz did not perfect a security interest in the vehicles, and Mullen purchased conditional sale contracts, not the vehicles themselves. This case presents a strikingly similar situation to that in *Morris Plan Co. v. Moody* (1968) 266 Cal.App.2d 28 [72 Cal.Rptr. 123] (*Morris Plan*), which supports the trial court's judgment that Quartz is the legal title holder of the vehicles, but under a different rationale than *Brasher's.* In *Morris Plan,* two vehicle owners sold their vehicles to Moody, a used car dealer, "in exchange for Moody's draft on his bank to be presented to the bank with the vehicles' title certificates." (*Id.* at p. 29.) Moody sold the vehicles to three individuals under conditional sale contracts. Morris Plan, a finance company, purchased the three conditional sale contracts from Moody. When the original owners presented Moody's drafts to his bank, the drafts were dishonored. The original owners refused to release the title certificates.

Morris Plan sued the original owners and Moody to quiet title to the three vehicles. Morris Plan argued that under the California Uniform Commercial Code, a transferor of goods has the power to transfer good title to a good faith purchaser for value even if the transferor acquired the goods in exchange for a dishonored check. (§ 2403.) But the court explained that the provisions of the Vehicle Code govern the transfer of title to vehicles, not section 2403. (*Morris Plan, supra,* 266 Cal.App.2d at pp. 29–30.) Furthermore, the Vehicle Code also governs the perfection of a security interest in a vehicle. "Sections 6300–6301 of the Vehicle Code provide a security interest in a vehicle is not perfected until the secured party has deposited with the Department of Motor Vehicles, a properly endorsed certificate of ownership showing the secured party as legal owner. When the security interest has been so perfected the rights of all persons shall be subject to the provisions of the Uniform Commercial Code." (*Id.* at p. 30.) The court found that the original owners retained title to the vehicles because title never passed from them to

Moody, and Morris Plan purchased security interests which had not been perfected in the manner required by the Vehicle Code.

■ Here, Mullen purchased the conditional sale contracts, which gave it the right to collect moneys due under their terms. (*Balfour, Guthrie & Co. v. Hansen* (1964) 227 Cal.App.2d 173, 187 [38 Cal.Rptr. 525].) But, as in *Morris Plan*, Mullen acquired no security interests from Mohawk, because Mohawk did not perfect them under the Vehicle Code. Thus Quartz holds title to the vehicles unimpaired by any security interests.

### *Quartz's Appeal*

Quartz contends the trial court erred in failing to give it a remedy against Mullen. It argues the policies of the California Uniform Commercial Code would be best served by requiring Mullen to pay it for the titles to the vehicles. We agree.

■ "[T]he ultimate goal of the California Uniform Commercial Code is to set forth rules of law that promote the optimal allocation of society's resources, i.e., promote economic efficiency. In the context of the used car industry, the goal can be restated as making vehicles available to consumers as efficiently as possible." (*Brasher's, supra*, 119 Cal.App.4th at p. 1053.) The goal of economic efficiency does not necessarily equate with the goal of fairness in tort law. "[T]ort law 'is designed primarily to apportion loss' and . . . the guiding principle in such an apportionment is fairness. 'In tort law courts have equated fairness with fault. The rule of comparative negligence is a perfect expression of this principle. [¶] The UCC, however, was designed to facilitate commerce primarily by guiding and making predictable the consequences of behavior,' and its loss apportionment function is secondary to this primary function. [Citations.] [¶] Although, for example, tort law ordinarily would distribute loss caused by a forged signature or endorsement on a negotiable instrument on the basis of fault, '[t]he UCC, however, for the most part does not look at actual fault. [Fn. omitted.] Instead, it places responsibility on the party which ordinarily would be in the best position to prevent the loss. [Fn. omitted; citations.] . . .' [Citation.]" (*Los Angeles Nat. Bank v. Bank of Canton* (1991) 229 Cal.App.3d 1267, 1278 [280 Cal.Rptr. 831].)

The findings of the trial court support the conclusion that Mullen is in the better position to prevent the loss caused by Mohawk while minimizing the disruption of the efficient flow of used vehicles from dealers to consumers. The trial court found that Mullen did not act in a commercially reasonable manner when it failed to verify Mohawk's title before purchasing the sale

contracts because a finance company could easily verify that a dealer had title, or it could ascertain who held the title and how much was owed to obtain it.

Another reason Mullen should bear the loss of Mohawk's default is because Mullen is Mohawk's assignee, thereby stepping into Mohawk's shoes. The parties stipulated that Mohawk had the duty to register the vehicles with the DMV reflecting the consumers as registered owners and Mullen as lienholder, which required the acquisition of the certificates of title. Qualin testified it was his responsibility as a dealer to get title into the consumer's name. "[A]nd it's the right thing to do. I mean you sell the car, you have to provide a title." The Automobile Sales Finance Act (Civ. Code, §§ 2981–2984.5) provides that "[a]n assignee of the seller's right is subject to all equities and defenses of the buyer against the seller, notwithstanding an agreement to the contrary, but the assignee's liability may not exceed the amount of the debt owing to the assignee at the time of the assignment." (Civ. Code, § 2983.5, subd. (a).)

Both the Automobile Sales Finance Act and the California Uniform Commercial Code are concerned with protecting the buyer who makes payments to the assignee of the conditional sale contract. Section 2210, subdivision (5), provides that "[a]n assignment of 'the contract' or of 'all my rights under the contract' or an assignment in similar general terms is an assignment of rights and, unless the language or the circumstances (as in an assignment for security) indicate the contrary, it is a delegation of performance of the duties of the assignor, and its acceptance by the assignee constitutes a promise by him or her to perform those duties. . . ." The Uniform Commercial Code comment explains, "Subsection (5) recognizes that the non-assigning original party has a stake in the reliability of the person with whom he has closed the original contract, and is, therefore, entitled to due assurance that any delegated performance will be properly forthcoming." (U. Com. Code com., 23A pt. 1 West's Ann. Cal. U. Com. Code, *supra*, foll. § 2210 at p. 236.)

Mullen argues only the buyers can enforce its performance of Mohawk's duties under the conditional sale contracts. But the buyers are not parties to this action. The trial court ruled that as between Quartz and Mullen, Quartz is the legal owner of the title certificates. The court erred in failing to order Mullen to purchase the titles from Quartz for transfer to the consumer buyers. The facts that Quartz has voluntarily released titles to some of the buyers and others have obtained duplicate titles from the DMV do not affect Mullen's duty.

## DISPOSITION

The portion of the judgment declaring Quartz to be the legal holder of the titles is affirmed, as is the judgment on the cross-complaint. The portion of the judgment that Quartz take nothing further under its second amended complaint is reversed, and the matter is remanded to the trial court to determine the amount of money due from Mullen to Quartz. Quartz is ordered to take the necessary steps through the DMV to ensure that title to each vehicle accurately reflects the consumer buyer's interest. In the interest of justice, each party shall bear its own costs on appeal.

Rylaarsdam, J., and Fybel, J., concurred.

The petition of appellant Mullen Bros., Inc., for review by the Supreme Court was denied September 19, 2007, S154234.