Filed 2/15/19; Certified for Publication 3/14/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RON MILLER ENTERPRISES, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> LOBEL FINANCIAL CORPORATION, INC., <br><br> Defendant and Respondent. | F076205 <br><br> (Super. Ct. No. 15CECG02661) <br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Donald S. Black, Judge.

D. Mitchell Taylor for Plaintiff and Appellant.

Lobel Financial Corporation, Ronald Green, Jr. and Gary Dean Lobel for Defendant and Respondent.

-ooOoo-

Ron Miller Enterprises, Inc. dba Fresno Commercial Lenders (plaintiff) provides short term loans to automobile dealers, also known as flooring loans.  In the present case, plaintiff made such loans to two now-defunct dealerships in the Fresno area, Elizabeth Chavez dba King of Kars (King of Kars) and Carmen Zepeda dba Cars of Clovis (Cars of Clovis) (also referred to as the dealership(s)).  Whenever plaintiff advanced a specific loan amount to either of the two dealerships, (i) the dealership in question signed a

separate agreement identifying a particular vehicle as collateral (collateral agreement) and (ii) plaintiff took possession of that vehicle's title certificate as security for the loan advance. These same vehicles were sold by King of Kars and Cars of Clovis to consumers under conditional sales contracts, and the conditional sales contracts were then sold and assigned by the dealerships to a finance company known as Lobel Financial Corporation, Inc. (defendant). Afterwards, both Cars of Clovis and King of Kars went out of business without repaying the sums loaned by plaintiff concerning the sold vehicles. Plaintiff, who still retained the title certificates for the vehicles and believed it had a perfected security interest, sued *defendant* for the amounts that plaintiff should have been paid by the dealerships (i.e., the loan amounts due) upon the sale of the subject vehicles. Allegedly, defendant was required under the circumstances to make such payment(s) to plaintiff to acquire the title certificates for said vehicles.

Plaintiff's claims were largely premised on the holding and rationale of the appellate decision in *Quartz of Southern California, Inc. v. Mullen Bros., Inc.* (2007) 151 Cal.App.4th 901 (*Quartz*). Here, in its decision following trial, the trial court held plaintiff did not have a security interest in the vehicles and further concluded the *Quartz* case was distinguishable. As a result, the trial court found in defendant's favor and did not require defendant to pay plaintiff the amounts allegedly due to obtain the title certificates for said vehicles. Plaintiff has appealed from the resulting defense judgment. For the reasons explained hereinbelow, we conclude the trial court prejudicially erred because the circumstances of this case were sufficiently close and/or analogous to those in the *Quartz* decision to warrant its application here. Accordingly, we reverse and remand the matter to the trial court for further proceedings to determine the precise amount due to plaintiff for defendant to obtain the title certificates for the vehicles pursuant to *Quartz*, after which a new judgment shall be entered by the trial court in favor of plaintiff.

# FACTS AND PROCEDURAL HISTORY

The Loan Transactions

Plaintiff entered a "Commercial Promissory Note" (Note) with each of the two dealerships, respectively, pursuant to which plaintiff agreed to extend credit to the individual dealership named therein. The purpose of the Notes, as observed by the trial court, was to finance the acquisition by the dealerships of used cars. The Notes established a revolving line of credit under which specific loan advances could be made but also provided that "[a]ll advances and fees are due and payable on the first day of sale or at the end of 120 days."

As each loan advance was made to a dealership under its line of credit, the dealership signed a separate "Collateral Agreement and Advance on Revolving Credit Line" (collateral agreement). Each of the collateral agreements indicated the specific loan advance was "for" a particular vehicle that was identified therein by its year, make, model, license number and vehicle identification number. The collateral agreements included spaces for indicating "80% of Kelly Book" and "Dealer Cost," and thus it appeared (and the trial court found) that the amount of each loan advance was based on a percentage of the estimated value of the vehicle. Under the terms of each of the collateral agreements, the loan obligation reflected therein was due "upon sale of vehicle," or by a certain date, whichever was first to occur. The collateral agreements further provided that "If, for any reason, the vehicle is returned to [plaintiff] for non-payment, [dealership] will pay the deficiency balance when [plaintiff] disposes of the vehicle."

In addition to requiring the dealerships to execute a collateral agreement for each separate loan advance, plaintiff also took physical possession of the title certificates for the vehicles identified in the collateral agreements. According to plaintiff, this was done "as evidence that the vehicles and their titles were/are security" for the loan amounts.

Plaintiff filed "UCC-1" financing statements (or UCC-1's) on both of the dealerships. As to King of Kars, plaintiff's UCC-1 listed as collateral "any and all

3.

vehicles, equipment, tools and accounts receivable located at 618 Fulton Street, Fresno, CA 93701 or any other locations controlled by … King of Kars." As to Cars of Clovis, plaintiff's UCC-1 listed as collateral "any and all vehicles, tools, equipment and accounts receivable located at 1308 Clovis Ave., Clovis, CA 93612 or any other locations controlled by … Cars of Clovis."

The Sale of the Vehicles

The trial court found, and neither party disputes, the following facts and circumstances relating to the sale of the vehicles: "The vehicles in question were sold by the dealerships to their customers pursuant to Conditional Sales Contracts that required down payments and monthly payments and provided that the title to the vehicles would serve as security for the performance of the loans [to the customers]. [Defendant] purchased the Conditional Sales Contracts from the dealerships but did not require that title certificates be provided at the time it paid the dealerships for the Contracts. [¶] The dealerships went out of business and did not repay the flooring loans from [Plaintiff]. [Defendant] has demanded that [Plaintiff] turn over the title certificates and [Plaintiff] has refused."

Summary of Pleadings

Plaintiff alleged a cause of action for declaratory relief, seeking a judicial declaration that defendant must pay plaintiff for the title certificates held by plaintiff as security for vehicle flooring loans made to the defunct dealership, King of Kars. A second lawsuit making substantially the same allegations was filed by plaintiff regarding vehicle flooring loans made to another defunct dealership, Cars of Clovis. The two actions were consolidated. According to plaintiff's allegations, the vehicles in question were sold by the dealerships to individual customers under conditional sales contracts. Defendant ultimately provided financing for the customers' purchases by taking assignment of (i.e., purchasing) the conditional sales contracts from the dealerships. However, in doing so, defendant failed to require production of the title certificates. The

4.

dealerships went out of business without paying the monies owed to plaintiff. Later, plaintiff refused to release the title certificates to defendant unless defendant paid off the loans made to the dealerships on the subject vehicles. In essence, plaintiff alleged— pursuant to the holding in *Quartz*—that as between plaintiff and defendant, plaintiff was the legal owner of the title certificates and was entitled to the requested declaratory relief because defendant "was in the position to prevent anyone from being harmed by [the dealerships] by requiring the production of the title certificates …." In its answer, defendant denied that plaintiff is entitled to the relief sought.

As summarized by the trial court, all parties other than defendant (i.e., Lobel Financial Corporation, Inc.) had been dismissed prior to trial from the consolidated action or defaulted. Thus, by the time of trial, the only matter to be resolved was the request for declaratory relief that we have described above.

Thirty Transactions Claimed

Plaintiff claims there were a combined total of 30 instances of vehicles sold by the dealerships to consumers where the resulting conditional sales contracts were assigned to defendant, and, as to the same vehicles, the dealerships had previously signed collateral agreements and surrendered the title certificates to plaintiff, but concerning which plaintiff was never paid on its loan advances. The 30 instances included seven vehicles sold by King of Kars and 23 vehicles sold by Cars of Clovis. In the instant appeal, plaintiff asserts the total principal due for its loan advances on the seven vehicles sold by King of Kars was $31,430, and the total principal due for its loan advances on the 23 vehicles sold by Cars of Clovis was $102,000. Plaintiff further asserts that it is entitled to these principal amounts plus the maximum interest allowable by law as payment for the title certificates to the vehicles. Since plaintiff did not prevail in the trial court, the court never addressed the issue of the precise amount that should be paid for the titles.[1]

---

[1] We note that because the amounts due for the titles largely present a factual matter that is best determined by the trial court, that issue will be remanded to the trial court.

5.

Trial Court's Decision

After consideration of the evidence introduced at trial and the parties' posttrial briefing, the trial court issued its statement of decision on July 21, 2017. In framing the issues, the trial court indicated that plaintiff contended it must be paid by defendant for the titles to the vehicles because *either* (i) plaintiff held a perfected security interest in the vehicles, *or* (ii) plaintiff was and is the lawful holder of the title certificates to the vehicles.

In its statement of decision, the trial court first addressed the issue of whether plaintiff had a security interest in the vehicles. The trial court reviewed the relevant documents, including the Notes, the collateral agreements and the UCC-1 financing statements and concluded that no security interest was ever created. The trial court reached this conclusion based on its assessment that the relevant documents failed to adequately or explicitly articulate an intent to create a security interest in the vehicles. Lacking an agreement to create a security interest, there was no existing security interest in place for the UCC-1 financing statements to perfect. Thus, the trial court concluded that plaintiff's security interest theory failed.

Next, the trial court addressed plaintiff's contention that because it held physical possession of the title certificates to the vehicles, defendant was required to pay plaintiff for them. The trial court acknowledged that plaintiff was relying on the applicability of the *Quartz* decision to support this claim. However, the trial court found that *Quartz* was inapplicable because of material factual differences between *Quartz* and the present case, including the fact that the plaintiff in *Quartz* was an automobile auction house that "actually owned legal title to the vehicles in question." The trial court continued: "Here, on the other hand, [plaintiff] is a finance company that loaned money to the dealerships, in exchange for the dealerships giving plaintiff physical custody of the title documents purportedly as security for the loans. There is no evidence that plaintiff ever actually intended to obtain … legal title to the subject vehicles, as opposed to holding the physical

6.

title documents as purported security for the loans." In other words, since plaintiff here was never the vehicles' owner nor in the chain of title, but merely had physical possession of the title certificates, the trial court held that *Quartz* was distinguishable. Accordingly, the trial court rejected plaintiff's claim that because it held the title certificates it was entitled to be paid by defendant.

The trial court's disposition was as follows: "As to [plaintiff's] claim for declaratory relief in … these consolidated actions, the court finds in favor of [defendant] and declares that [defendant] is not obligated to pay [plaintiff] for the title certificates for the vehicles which are the subject of this action." Plaintiff's timely notice of appeal followed.

## DISCUSSION

### I. Standard of Review

We independently review the trial court's rulings on questions of law, including issues of statutory construction and the correct application of a statute under undisputed facts. (*Brasher's Cascade Auto Auction v. Valley Auto Sales & Leasing* (2004) 119 Cal.App.4th 1038, 1048 (*Brasher's*).) We also exercise de novo review regarding the interpretation of written contracts or other writings. (*Mayer v. C.W. Driver* (2002) 98 Cal.App.4th 48, 57 ["[u]nless resolution depends on the credibility of conflicting extrinsic evidence, the interpretation of a writing involves a question of law for de novo review by the appellate court"]; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866.) Findings of fact set forth in the trial court's statement of decision are reviewed under the substantial evidence standard. (*Brasher's*, *supra*, 119 Cal.App.4th at p. 1048.)

Here, it appears that the essential issues raised are questions of law, including the interpretation of written agreements and the application of legal or statutory principles under undisputed facts. Therefore, we exercise de novo review.

7.

## II. Plaintiff's Alleged Security Interest

Plaintiff first argues that it was entitled to receive payment for the certificates of title from defendant because, allegedly, plaintiff had a perfected security interest in the vehicles in question. As noted, the trial court rejected this theory of recovery due to its finding that no security interest was agreed to by plaintiff and the dealerships. In the instant appeal, plaintiff contends the trial court's finding and conclusion on this matter were in error. We shall consider this issue in two parts by initially addressing the extent to which plaintiff had a perfected security interest, and then deciding whether any such interest would entitle plaintiff to the relief sought in this case.

A. The Existence of a Security Interest

Where a motor vehicle is concerned, the manner of perfecting a security interest is governed by either the Vehicle Code or the Uniform Commercial Code,[2] depending on whether the vehicle in question constituted inventory. (See, *Quartz*, *supra*, 151 Cal.App.4th at p. 908 [stating Vehicle Code provides the exclusive method of perfecting a security interest "in a vehicle not constituting inventory"]; *Louis & Deiderich, Inc. v. Cambridge European Imports, Inc.* (1987) 189 Cal.App.3d 1574, 1585 [stating that since vehicle was part of dealer's inventory, "the Commercial Code, rather than the Vehicle Code governs the manner of perfecting the security interest"].) The general rule and primary method for effectuating a security interest in a vehicle is set forth in Vehicle Code section 6300. Under that section, no security interest in a motor vehicle is perfected until the secured party has submitted to the Department of Motor Vehicles (DMV) a properly endorsed "certificate of ownership"[3] to the vehicle subject to the

---

[2]     Unless otherwise indicated, all further statutory references are to our state's Uniform Commercial Code.

[3]     A vehicle's "certificate of ownership" is the same as what we have referred to herein as a title certificate. (See, e.g., *Hirsch v. Department of Motor Vehicles* (1974) 42 Cal.App.3d 252, 257; *T&O Mobile Homes, Inc. v. United California Bank* (1985) 40

security interest showing the secured party as legal owner. (§ 6300; see also Veh. Code § 5600 [similar rule concerning transfers of title or ownership].) However, an exception to this general rule exists pursuant to Vehicle Code section 5907 where the vehicle constitutes *inventory*. (See Veh. Code, § 6300 [stating exception under § 5907]; see also § 9311, subds. (a)(2)(A) & (d).) Vehicle Code section 5907 states, in pertinent part, as follows: "A secured party who holds a security interest in a registered vehicle that constitutes inventory as defined in the Uniform Commercial Code, who has possession of the certificate of ownership issued for that vehicle, … need not make application for a transfer of registration and the Uniform Commercial Code shall exclusively control the validity and perfection of that security interest."

Here, the trial court found that the vehicles in question were held by the dealerships as inventory. Based on that finding, which the parties do not dispute, the trial court correctly observed that the question of whether plaintiff had an enforceable security interest in the vehicles must be "analyzed pursuant to the California Uniform Commercial Code." Division 9 of that code (sections 9101 et seq.) " 'sets out a comprehensive scheme for the regulation of security interests in personal property.' " (*T&O Mobile Homes, Inc. v. United California Bank*, *supra*, 40 Cal.3d at p. 446.) We now consider those provisions.

Under section 9203, a security interest is created with respect to specific collateral when three elements are present: (1) the debtor has authenticated (or signed)[4] a security agreement describing the collateral, (2) value has been given, and (3) the debtor has rights in the collateral. (*New West Fruit Corp. v. Coastal Berry Corp.* (1991) 1 Cal.App.4th 92, 97 (*New West*); *Louis & Diederich, Inc. v. Cambridge European*

---

Cal.3d 441, 449 [under California law, title and security interests reflected in the certificate of ownership]; Veh. Code, §§ 370, 460, 4450.)

[4] The term "authenticate" means "to do either of the following: [¶] (A) To sign. [¶] (B) To with present intent to adopt or accept a record, attach to or logically associate with the record an electronic sound, symbol, or process." (§ 9102, subd. (a)(7).)

*Imports, Inc.*, *supra*, 189 Cal.App.3d at p. 1586; § 9203, subd. (b)(1), (2), (3)(A).) Here, the second and third elements were clearly established on the record before us,[5] and only the first element—i.e., whether a security agreement was entered concerning the collateral (i.e., the subject vehicles)—is at issue in the present appeal. In its statement of decision, the trial court reviewed the relevant documents and concluded there was no security agreement in place between plaintiff and the dealerships. For reasons explained below, we disagree.

A "security agreement" is defined as "an agreement that creates or provides for a security interest." (§ 9102, subd. (a)(74).) The "property subject to a security interest" is referred to in the code as the "collateral." (§ 9102, subd. (a)(12).) A security agreement is "effective according to its terms between the parties, against purchasers of the collateral, and against creditors." (§ 9201, subd. (a).) A security agreement must be authenticated (i.e., signed) by the debtor and it must adequately describe the collateral. (§ 9203, subd. (b)(3).) The term "security interest" is defined under the basic definitional provisions of the Uniform Commercial Code as follows: " 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation…." (§ 1201, subd. (b)(35).)

The case law makes clear that no special wording or formulaic language is required to evidence that the parties intended to create a security interest. "[T]he creation of a valid security interest turns on 'whether the parties intended the transaction to have effect as security.' [Citations.]" (*New West*, *supra*, 1 Cal.App.4th at p. 97.) Therefore: " 'No special form is necessary to create a security interest. [Citation.] It is sufficient if the parties use language that indicates the parties intended to create a security interest …

---

[5] As noted by plaintiff's opening brief, value was given in the form of the loan advances (thereby meeting the second element); and the loans were apparently for 80 percent of value and, thus, there was approximately 20 percent unencumbered equity owned by the dealerships while the vehicles remained in the dealerships' possession as part of their inventory to be sold to customers (thereby meeting the third element).

and if the security agreement reasonably identifies the property subject to the agreement.' [Citations.]" (*Id*. at pp. 97–98; see also *In re Amex-Protein Development Corp*. (9th Cir. 1974) 504 F.2d 1056, 1059 [no magic words necessary to create security interest].)

Further, the security agreement and the parties' intent need not be evidenced by a single stand-alone written document, but may be ascertained through consideration of several documents. (*Komas v. Future Systems, Inc*. (1977) 71 Cal.App.3d 809, 813–814 (*Komas*).) In *Komas*, the appellate court viewed several writings together to reach its conclusion that the parties intended to create a security interest in the collateral. It summarized this conclusion as follows: "No special form is necessary to create or provide for a security interest. [Citation.] It is sufficient if the parties use language which leads to the conclusion that it was the intention of the parties that a security interest be created. [Citations.] In the present case, the financing statement, loan application, promissory note and other documents, taken together, establish that there was an agreement to create or provide for a security interest. [Citations.]" (*Id*. at p. 816.)

Applying these principles to the matter before us, we conclude that plaintiff and the dealerships *did* intend to create a security interest in the vehicles identified within the collateral agreements. That intent was especially shown by the collateral agreements themselves. As summarized previously herein, when each loan advance was made by plaintiff to a dealership under its line of credit, the dealership signed a separate collateral agreement specifically identifying a particular vehicle, stating the loan advance was "for" that particular vehicle, and requiring repayment of the loan advance upon the sale of the same vehicle or by a certain date, whichever was first to occur. The collateral agreements further provided that "If, for any reason, the vehicle is returned to [plaintiff] for non-payment, [dealership] will pay the deficiency balance when [plaintiff] disposes of the vehicle." These terms plainly establish the vehicles described in the collateral agreements were intended to serve as collateral for, or to effectively secure, the loan advances. The fact that plaintiff would have a right to dispose of a vehicle if the

dealership defaulted leaves no room for doubt that an actual security interest in the vehicles was intended.

Moreover, in addition to requiring that the dealerships execute a collateral agreement for each separate loan advance, plaintiff also took physical possession of the title certificates for the vehicles identified in the collateral agreements. According to plaintiff, this was done "as evidence that the vehicles and their titles were/are security" for the loan amounts. We agree this course of performance evidenced the nature of the parties' agreement as constituting a security interest. The Uniform Commercial Code defines the term "agreement" to mean "the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade …." (§ 1201, subd. (b)(3).) As we concluded hereinabove, the language of the collateral agreements was, by itself, sufficient to reflect an intention to create a security interest. However, the correctness of that conclusion is strongly confirmed and corroborated by the undisputed fact that the title certificates to the vehicles identified as collateral were surrendered by the dealerships to plaintiff and were retained in plaintiff's possession. Although a security interest may exist without regard to the location of title (see § 9202), that does not mean that holding the title certificates is irrelevant to the issue of whether the parties to the transaction intended to create a security interest. To the contrary, the fact that the title certificates to the vehicles were surrendered to plaintiff, as part of the underlying loan transactions, was indicative in this case of an intent to create or facilitate a security interest. (See Veh. Code, § 5907 [Uniform Commercial Code controls validity and perfection of security interest in vehicles in a car dealer's inventory where secured party has possession of certificates of ownership of the vehicles]; see also, e.g., § 1201, subd. (b)(35) [a retention of title by a seller generally indicative of security interest].)

Finally, we consider plaintiff's publicly filed UCC-1 financing statements covering vehicles located at both the dealerships. As the trial court correctly observed,

12.

since the financing statements were not executed by the dealerships and described the collateral in very general terms, they were insufficient by themselves to establish the existence of any underlying agreement(s) on the part of the dealerships to grant security interests to plaintiff in particular vehicles. Nevertheless, the financing statements may be considered together with the other relevant documents. (*Komas*, *supra*, 71 Cal.App.3d at pp. 813–814.) Here, as we explained in our discussion above, the other documents (i.e., collateral agreements) sufficiently demonstrated the existence of security agreement(s); therefore, the UCC-1 financing statements are not necessary for that purpose. We do note, however, that when considered together with the other evidence, the financing statements filed by plaintiff concerning the two dealerships are consistent with our conclusion that the underlying agreements and loan transactions entered by plaintiff with the dealerships were intended to create enforceable security interests in the vehicles identified in the collateral agreements. (See, e.g., *Goehring v. Superior Court* (1998) 62 Cal.App.4th 894, 907 [the purpose of filing a financing statement is to give notice to and assure priority over other creditors and interested third parties with respect to security interests in collateral]; *Turbinator, Inc. v. Superior Court* (1995) 33 Cal.App.4th 443, 451 [filing of financing statement perfects security interest as against creditors and transferees of the debtor].)

Based on the foregoing analysis, we conclude that plaintiff did have security interests in the vehicles in the dealerships' inventory that were identified in the collateral agreements. Furthermore, it appears that plaintiff's security interests were perfected in light of the filing of the UCC-1 financing statements on the dealerships describing the covered collateral as, among other things, "all vehicles … located at" the dealerships. (§ 9310, subd. (a) [security interest perfected by filing financing statement]; see also § 9311, subds. (a)(2)(A) & (d) [filing a financing statement is an applicable and effective method for perfection of security interest in motor vehicle that is in inventory held for sale or lease].)

13.

Defendant has questioned in a cursory fashion the adequacy of the collateral descriptions set forth in the financing statements, but we conclude they are sufficient. A financing statement need only "indicate[] the collateral covered by the financing statement." (§ 9502, subd. (a)(3).) As the trial court explained, the indication of collateral covered in a financing statement may be, and often is, broader or more general than the collateral description in the security agreement. (See *Northwest Acceptance Corp. v. Lynnwood Equipment, Inc*. (9th Cir. 1988) 841 F.2d 918, 921 [explaining different purpose behind collateral description in security agreement and in a financing statement].) Generally speaking, a financing statement sufficiently indicates the collateral where, as here, it describes the type or category of property items covered, which may include stating "all" of a type or category of property items. (See § 9504 [sufficient to indicate "all" assets]; Official Comments on Uniform Commercial Code § 9504, comment 2 [noting that narrower description than "all assets," such as "all assets other than automobiles" is sufficient for purposes of this section]; § 9108, subd. (b)(2) [sufficient to reasonably identify collateral by category]; *Biggins v. Southwest Bank* (9th Cir. 1973) 490 F.2d 1304, 1308 [financing statement which described the assets covered as "new and used automobiles" was sufficient since the purpose of a financing statement is to merely alert the third party to the need for further investigation as to perfected security interest].) Thus, the financing statements here adequately indicated the collateral; plaintiff's security interests in the vehicles were perfected.

B. Impact on Relief Sought by Plaintiff

However, our conclusion that plaintiff did have perfected security interests in the subject vehicles held by the dealerships as inventory does not mean that plaintiff prevails on its security interest theory of recovery. Defendant points out that to the extent plaintiff had security interests in the vehicles identified in the collateral agreements, the security interests did not continue to exist in the vehicles once they were sold by the dealerships to consumers. Defendant is correct.

14.

A security interest in collateral does not continue to apply after sale of the collateral if the sale was authorized by the secured party free of the security interest. (*Brasher's*, *supra*, 119 Cal.App.4th at p. 1049; § 9315, subd. (a)(1); see also § 2403, subd. (2).)  Here, the collateral agreements and Notes clearly reflected the parties' understanding that the dealerships would be selling the vehicles identified in the collateral agreements.  In fact, the basic triggering event for the loans to be repaid was the sale of the vehicles by the dealerships.  Since the dealerships were in the business of selling used cars to consumers, the sales contemplated by the parties necessarily included sales to consumers.  Obviously, where a consumer purchases a vehicle from a used car dealer such as the dealerships here, the vehicle would be sold to the consumer unencumbered by the dealer's flooring loan obligations or the flooring lender's security interests.  We conclude that plaintiff, as the secured party, authorized the dealerships to sell the vehicles to consumers free and clear of plaintiff's security interest, and therefore the security interests did not continue in the vehicles once those sales to consumers occurred under the conditional sales contracts.[6]

It follows that plaintiff's security interest theory of recovery fails.  When defendant purchased the conditional sales contracts from the dealerships, the security interests that had previously existed in the vehicles while they were in inventory no longer continued.  Consequently, to the extent that plaintiff is seeking relief against defendant (i.e., payment for the title certificates) as a remedy for enforcement of the security interests as such, plaintiff's claim falls short and cannot prevail.

However, we would also observe that the filing of the UCC-1 financing statements, by which plaintiff's security interests were perfected as to each of the subject

---

[6]    Because of our conclusion, we need not address defendant's additional argument that the consumers who purchased the vehicles from the dealerships would take free of the security interests as buyers in the ordinary course of business pursuant to section 9320, subd. (a).  (See § 1201, subd. (b)(9) [defining "buyer in ordinary course of business"].)

15.

vehicles prior to their individual sale(s) to consumers, provided notice to consumer financing lenders such as defendant that a reasonable inquiry should be made concerning the nature and circumstances of any potential security interest. (See, e.g., *Cassel v. Kolb* (1999) 72 Cal.App.4th 568, 575 [a financing statement puts third parties on notice that another party may have a security interest in the collateral and that further inquiry is required].) Moreover, since vehicles were indicated as collateral in the financing statements, and since title certificates to vehicles in the used car industry are sometimes held by a creditor as a security device in regard to such vehicles (see Veh. Code, § 5907), a reasonable inquiry by defendant would have included the status of title and/or where the title certificates were held. The notice provided by the financing statements is a consideration weighing in favor of plaintiff's claim that the *Quartz* case should apply here. We now turn to that alternative ground upon which plaintiff sought declaratory relief in its action against defendant.

### III. Plaintiff's Claim for Relief Based on *Quartz*

Plaintiff contends that the holding of *Quartz*, *supra*, 151 Cal.App.4th 901, is applicable to this case, and therefore defendant is required to pay plaintiff to acquire the certificates of title. Defendant's position is that *Quartz* is distinguishable because of plaintiff's status as a mere flooring lender rather than a wholesaler/seller in the chain of ownership as was the *Quartz* plaintiff. The trial court agreed with defendant and concluded that *Quartz* did not apply. As explained below, we conclude that plaintiff is correct. We begin our consideration of this issue with a summary of the *Quartz* case.

A. The *Quartz* Case

In *Quartz*, the plaintiff was a wholesale used car auction known as Quartz of Southern California, Inc. (Quartz) that would acquire used vehicles and sell them to other dealers at an auction sale. (*Quartz*, *supra*, 151 Cal.App.4th at p. 904.) For various reasons, title was usually not available at the time of auction. (*Ibid*.) Although Quartz would generally require a buying dealer to pay for vehicles before taking possession,

16.

some buying dealers by prior arrangement with Quartz were permitted to take the vehicles after agreeing to return and pay for title when it became available. (*Ibid.*) In the latter case, the buying dealer would not be obligated to pay for the vehicles until Quartz received the title certificates from the original selling dealer. (*Ibid.*) Mohawk was a used car dealer that had such an arrangement with Quartz. Mohawk purchased 17 vehicles at auction from Quartz and took possession without paying. With Quartz's knowledge, Mohawk sold the 17 vehicles to individual customers, and each customer financed his or her purchase through a conditional sales contract. Mohawk then sold the conditional sales contracts to Mullen, a finance company. (*Ibid.*) Quartz paid its selling dealers for all 17 vehicles and received title certificates to each one. When Quartz notified Mohawk that payment was due for the 17 vehicles, it discovered that Mohawk had gone out of business, leaving a debt to Quartz of $94,720. Quartz refused to release the title certificates until Mullen, as the finance company purchasing the conditional sales contracts, paid Quartz on Mohawk's behalf. Mullen refused. (*Ibid.*) Subsequently, Quartz agreed to release title certificates to each consumer who paid off his or her indebtedness under the conditional sales contracts, but Quartz preserved its right to pursue a remedy against Mullen. (*Id.* at p. 905.) We note that although Quartz possessed the title certificates, it did not perfect a security interest in the vehicles. (*Id.* at p. 909.)

In the trial of declaratory relief claims on the question of whether Mullen had to pay Quartz for the title certificates, the trial court held that, as between Quartz and Mullen, Quartz was the lawful owner or holder of the title certificates, but the trial court refused to require Mullen to pay Quartz for the certificates. Both parties appealed. (*Quartz*, *supra*, 151 Cal.App.4th at pp. 904–906.) The Court of Appeal affirmed the trial court's holding that Quartz was the lawful owner of the title certificates (*id.* at p. 904) but reversed the portion of the judgment failing to award money to Quartz, holding "[t]he trial court erred in failing to order Mullen to purchase the titles from Quartz for transfer to the consumer buyers." (*Id.* at p. 911.) The case was remanded to the trial court to

17.

determine the amount Mullen owed Quartz as payment for the title certificates. (*Id*. at p. 912.)

In reaching this result, the Court of Appeal in *Quartz* first addressed Mullen's contentions that Quartz's rights, if any, as holder of the title certificates were eclipsed or cut-off under provisions of the Uniform Commercial Code relating to (i) the passage of title with respect to the sale and delivery of the "goods" to Mohawk and then to the purchasing consumers, and (ii) Mullen's purported status as a secured party because of its purchase from Mohawk of the conditional sales contracts. (*Quartz*, *supra*, 151 Cal.App.4th at pp. 906–908; see also p. 909 [noting Mullen was not a purchaser of the vehicles themselves, but only of the conditional sales contracts].) *Quartz* rejected these contentions because the Vehicle Code's title and record requirements for effectuating title transfers and perfecting security interests in motor vehicles governed, not the Uniform Commercial Code. (*Quartz*, *supra*, 151 Cal.App.4th at pp. 906–908, citing Veh. Code, §§ 5600 & 6300.) Neither Mohawk nor Mullen had complied with the Vehicle Code title/registration requirements with respect to title transfers or perfection of security interests in the sold vehicles, and therefore Mullen's claims were without merit. Thus, as between Quartz and Mullen, it was held that "Quartz holds title to the vehicles unimpaired by any security interests." (*Id*. at p. 910.)

Next, the Court of Appeal in *Quartz* proceeded to address Quartz's claim that Mullen had to pay it for the title certificates. (*Quartz*, *supra*, 151 Cal.App.4th at p. 910.) In concluding the trial court had erred in not providing Quartz a remedy against Mullen, *Quartz* considered the policies of the Uniform Commercial Code and found that such policies "would be best served by requiring Mullen to pay [Quartz] for the titles to the vehicles." (*Ibid*.) The decision explained the relevant statutory policies as follows: " '[T]he ultimate goal of the California Uniform Commercial Code is to set forth rules of law that promote the optimal allocation of society's resources, i.e., promote economic efficiency. In the context of the used car industry, the goal can be restated as making

vehicles available to consumers as efficiently as possible.' [Citation.]" (*Quartz*, *supra*, at p. 910.) An important aspect of this goal is to facilitate such commerce " ' "primarily by guiding and making predictable the consequences of behavior," ' " and only secondarily to apportion fault. (*Ibid.*) Thus, for the most part the Uniform Commercial Code " ' "*places responsibility on the party which ordinarily would be in the best position to prevent the loss*. [Citations.] …" [Citation.]' [Citation.]" (*Ibid.*, italics added.) In applying this statutory policy, *Quartz* found that Mullen, the finance company, was "in the better position to prevent the loss caused by Mohawk while minimizing the disruption of the efficient flow of used vehicles from dealers to consumers," and also agreed with the trial court that "Mullen did not act in a commercially reasonable manner when it failed to verify Mohawk's title before purchasing the sale contracts because a financing company could easily verify that a dealer had title, or it could ascertain who held the title and how much was owed to obtain it." (*Id.* at pp. 910–911.)

Quartz went on to explain another reason that Mullen should bear the loss of Mohawk's default: In purchasing the conditional sales contracts, Mullen was Mohawk's *assignee* and stepped into Mohawk's (the dealer's) shoes, which carried with it certain responsibilities. (*Quartz*, *supra*, 151 Cal.App.4th at p. 911.) The parties conceded that Mohawk, as the dealer, had a duty to register the vehicles with the DMV reflecting the consumers as registered owners and Mullen as lienholder, which required the acquisition of the certificates of title. Mohawk's sale of the conditional sales contracts to Mullen meant that Mohawk's performance of that obligation was assigned or delegated to Mullen. (*Ibid.*) That is, Mullen was required to meet the dealer's (Mohawk's) obligation to furnish the title documentation with respect to the consumer's conditional sales contracts by completing the transfer of ownership records necessary pursuant to Vehicle Code sections 5600 and 6300, and to do so it had to acquire the title certificates. *Quartz* further explained that, under the Uniform Commercial Code, an assignment of a contract

19.

ordinarily includes a delegation of the performance of duties the assignor had to the non-assigning original party, and acceptance by the assignee constitutes a promise by him or her to perform those duties. (*Quartz, supra,* at p. 911.) In rejecting Mullen's argument that only the buyers of the used cars could enforce Mullen's performance of Mohawk's duties under the conditional sales contracts, the court responded: "But the buyers are not parties to this action. The trial court ruled that as between Quartz and Mullen, Quartz is the legal owner of the title certificates. The court erred in failing to order Mullen to purchase the titles from Quartz for transfer to the consumer buyers." (*Ibid*.)

B. Applicability of *Quartz*

Plaintiff argues that *Quartz* is applicable to the present case because defendant, as the finance company purchasing the conditional sales contracts, was in the last and best position to prevent loss by simply requiring production of title certificates from the dealerships or at least verifying who held the title certificates and how much was owed to obtain them. Because defendant failed to do so, plaintiff argues defendant should be required to pay plaintiff for the certificates of title as was required in *Quartz*. We agree. The parallels between *Quartz* and the present case are substantial. Here, as in *Quartz*, (i) plaintiff is in rightful possession of the title certificates to the vehicles that were sold by the dealerships to consumers under conditional sales contracts, (ii) the dealerships went out of business without paying what was owed to plaintiff concerning said vehicles, and (iii) defendant as finance lender took assignment of the conditional sales contracts without requiring production of the title certificates or ascertaining who held title and how much was owed to obtain it. Moreover, the statutory policy grounds relied on in *Quartz* of placing responsibility on the party that would be in the best position to prevent loss is as compelling here as it was in *Quartz*, as is the fact that defendant, as assignee of the conditional sales contracts, stepped into the dealerships' shoes regarding the obligation to provide completed title and registration documentation to the buyers under the conditional sales contracts. Finally, here we have another significant factor

20.

supporting the application of *Quartz*: Namely, plaintiff's UCC-1 financing statements put defendant on notice that the vehicles in question were potentially subject to security interests held by plaintiff and that reasonable inquiry should be made before proceeding with the purchase of the conditional sales contracts.

For all these reasons, we conclude that *Quartz* is applicable, and, accordingly, defendant is required to pay plaintiff for the title certificates.

In so holding, we briefly note defendant's counterargument, which was adopted by the trial court. Defendant contends that *Quartz* is distinguishable because plaintiff here was merely a flooring lender, not a seller of the vehicles as was the case in *Quartz*. In other words, as an actual wholesaler/seller, Quartz was or could have been placed on the title certificates as an owner of the vehicles. We are not persuaded that this fact, by itself, presents a material difference. Instead, the circumstances in common with *Quartz* would appear to be far more significant. That is, both plaintiff and Quartz were owed money by the automobile dealers, the money owed was with respect to particular cars held by the automobile dealers as inventory, and both plaintiff and Quartz retained the title certificates to those cars. Thus, the circumstances of the plaintiffs in the two cases are closely analogous. In light of these substantial parallels, whatever differences may otherwise have existed between plaintiff (as holder of title certificates to vehicles as a flooring lender to a car dealer) and Quartz (as holder of title certificates to vehicles as a wholesaler selling to a car dealer), they do not appear to diminish the force of the compelling rationale set forth in *Quartz*. We therefore reject defendant's attempt to distinguish *Quartz*.

Finally, having rejected defendant's argument that plaintiff could not qualify as a *Quartz* plaintiff, we conclude by emphasizing that *defendant* in the instant case was plainly a *Quartz* defendant. As the finance lender purchasing the conditional sales contracts, defendant was essentially in the identical position as the defendant in *Quartz*. In both instances, the defendant/finance lender was the party in the best position to

21.

prevent loss by obtaining the title certificates or making reasonable inquiry about the status and location of title prior to completing the purchase of the conditional sales contracts. Accordingly, *as between plaintiff and defendant*, we conclude that plaintiff is in rightful possession of the title certificates and, under all the circumstances, defendant is required to pay plaintiff to obtain them.

## **DISPOSITION**

The judgment is reversed, and the matter is remanded to the trial court to determine the precise amount of money defendant must pay plaintiff for the title certificates to the vehicles in question, after which a new judgment shall be entered in favor of plaintiff. Costs on appeal are awarded to plaintiff.

_____
LEVY, Acting P.J.

WE CONCUR:

_____
FRANSON, J.

_____
PEÑA, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RON MILLER ENTERPRISES, INC.,<br><br>        Plaintiff and Appellant,<br><br>                v.<br><br>LOBEL FINANCIAL CORPORATION, INC.,<br><br>        Defendant and Respondent. | F076205<br><br>(Fresno Super. Ct. No.<br>15CECG02661)<br><br>**ORDER GRANTING REQUEST<br>FOR PUBLICATION** |

As the nonpublished opinion filed on February 15, 2019, in the above entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified for publication in the Official Reports.

LEVY, Acting P.J.

WE CONCUR:

FRANSON, J.

PEÑA, J.